# VIRGINIA v. TENNESSEE.

ORIGINAL.

No. 3. Original. Argued March 8, 9, 1893. — Decided April 3, 1893.

The boundary line between the States of Virginia and Tennessee, which was ascertained and adjusted by commissioners appointed by and on behalf of each State, and marked upon the surface of the ground between the summit of White Top Mountain and the top of the Cumberland Mountains, having been established and confirmed by the State of Virginia in January, 1803, and by the State of Tennessee in November, 1803, and having been recognized and acquiesced in by both parties for a long course of years, and having been treated by Congress as the true boundary between the two States, in its districting them for judicial and revenue purposes, and in its action touching the territory in which Federal elections were to be held and for which Federal appointments were to be made, was a line established under an agreement or compact between the two States, to which the consent of Congress was constitutionally given; and, as so established, it takes effect as a definition of the true boundary, even if it be found to vary somewhat from the line established in the original grants.

The history of the Royal Grants, and of the Colonial and State Legislation upon this subject reviewed.

An agreement or compact as to boundaries may be made between two States, and the requisite consent of Congress may be given to it subsequently, or may be implied from subsequent action of Congress itself towards the two States; and when such agreement or compact is thus made, and is thus assented to, it is valid.

What "an agreement or compact" between two States of the Union is, and what "the consent of Congress" to such agreement or compact is, within the meaning of Article I of the Constitution, considered and explained.

A boundary line between States or Provinces which has been run out, located and marked upon the earth, and afterwards recognized and acquiesced in by the parties for a long course of years, is conclusive.

THE case is stated in the opinion.

*Mr. R. Taylor Scott*, Attorney General of the State of Virginia, *Mr. William F. Rhea* and *Mr. Rufus A. Ayers*, for the State of Virginia.

*Mr. George W. Pickle*, Attorney General of the State of Tennessee, (with whom was *Mr. N. M. Taylor, Mr. H. H. Haynes, Mr. Thomas Curtin* and *Mr. C. J. St. John* on the

brief,) *Mr. Abram L. Demoss* and *Mr. A. S. Colyar* for the State of Tennessee.

. Mr. Justice Field delivered the opinion of the court.

This is a suit to establish by judicial decree the true boundary line between the States of Virginia and Tennessee. It embraces a controversy of which this court has original jurisdiction, and in this respect the judicial department of our government is distinguished from the judicial department of any other country, drawing to itself by the ordinary modes of peaceful procedure the settlement of questions as to boundaries and consequent rights of soil and jurisdiction between States, possessed, for purposes of internal government, of the powers of independent communities, which otherwise might be the fruitful cause of prolonged and harassing conflicts.

The State of Virginia, as the complainant, summoning her sister State, Tennessee, to the bar of this court — a jurisdiction to which the latter promptly yields — sets forth in her bill the sources of her title to the territory embraced within her limits, and also of the title to the territory embraced by Tennessee.

The claim of Virginia is that by the charters of the English sovereigns, under which the colonies of Virginia and North Carolina were formed, the boundary line between them was intended and declared to be a line running due west from a point on the Atlantic Ocean on the parallel of latitude thirty-six degrees and thirty minutes north, and that the State of Tennessee, having been created out of the territory formerly constituting a part of North Carolina, the same boundary line continued between her and Virginia. And the contention of Virginia is that the boundary line claimed by Tennessee does not follow this parallel of latitude but varies from it by running too far north, so as to unjustly include a strip of land about one hundred and thirteen miles in length and varying from two to eight miles in width, over which she asserts and unlawfully exercises sovereign jurisdiction.

On the other hand, the claim of Tennessee is that the

boundary line, as declared in the English charters, between the colonies of Virginia and North Carolina was run and established by commissioners appointed by Virginia and Tennessee after they became States of the Union, by Virginia in 1800 and by Tennessee in 1801, and that the line they established was subsequently approved in 1803 by the legislative action of both States, and has been recognized and acted upon as the true and real boundary between them ever since, until the commencement of this suit, a period of over eighty-five years. And the contention of Tennessee is that the line thus established and acted upon is not open to contestation as to its correctness at this day, but is to be held and adjudged to be the real and true boundary line between the States, even though some deviations from the line of the parallel of latitude thirty-six degrees and thirty minutes north may have been made by the commissioners in the measurement and demarcation of the line.

In order to clearly understand and appreciate the force and effect to be accorded to the respective claims and contentions of the parties, a brief history of preceding measures should be given, with reference to the charters and legislation under which they were taken.

On the 23d of May, 1609, James the First of England, by letters patent, reciting previous letters, gave to Robert, Earl of Salisbury, Thomas, Earl of Suffolk, and divers other persons associated with them, a charter which organized them into a corporation by the name of The Treasurer and Company of Adventurers and Planters of the city of London, for the first colony of Virginia, and granted to them all those lands and territories, lying "in that part of America called Virginia, from the point of land called Cape or Point Comfort, along the sea coast to the northward 200 miles, and from the said point of Cape Comfort along the sea coast to the southward 200 miles, and all that space and circuit of land lying from the sea coast of the precinct aforesaid up into the land throughout, from sea to sea, west and northwest"; and, "also all the islands lying within 100 miles along the coast of both seas of the precinct aforesaid."

On the 24th of March, 1663, Charles the Second of England granted to Edward, Earl of Clarendon, and others of his subjects, all that territory within his dominion of America "extending from the north end of the island called Lucke Island, which lyeth in the Southern Virginia seas and within six and thirty degrees of the northern latitude, and to the west as far as the South Seas, and so southerly as far as the river Mathias, which bordereth upon the coast of Florida, and within one and thirty degrees of northern latitude, and so west in a direct line as far as the South Seas aforesaid," and gave them full authority to organize and govern the territory granted under the name of the Province of Carolina.

On the 30th of May, 1665, Charles the Second granted to the above proprietors of Carolina a charter, confirming the previous grant, and enlarging the same so as to include the following-described territory : All that province and territory within America, " extending north and eastward as far as the north end of Currituck River or inlet, upon a straight westerly line to Wyonoke Creek, which lies within or about the degrees of thirty-six and thirty minutes northern latitude; and so west in a direct line as far as the South Seas ; and south and westward as far as the degrees of twenty-nine inclusive of northern latitude, and so west in a direct line as far as the South Seas."

The northern and southern settlements of Carolina were separated from each other by nearly three hundred miles, and numerous Indians resided upon the intervening territory, and though the whole province belonged to the same proprietors, the legislation of the settlements was by different assemblies, acting at times under different governors. Early in 1700 the northern part of the province was sometimes called the colony of North Carolina, though the province was not divided by the crown into North and South Carolina until 1732. (Story's Commentaries on the Constitution, sec. 137.) Previously to this division the settlements on the borders of Virginia, and of what was called the colony of North Carolina, had largely increased, and disputes and altercations frequently occurred between the settlers, growing out of the

unlocated boundary between the provinces. Virginians were charged with taking up lands, under titles of the crown, south of the proper limits of their province, and Carolinians were charged with taking up lands which belonged to the crown with warrants from the proprietors. The troubles arising from this source were the occasion of much disturbance to the communities, and various attempts were made by parties in authority in the two provinces to remove the cause of them. Previously to January, 1711, commissioners were appointed on the part of Virginia and North Carolina to run the boundary line between them, and proclamations were made forbidding surveys of the grounds until that line within the disputed limits should be marked. But these efforts for the settlement of the difficulties were unavailing.

In January, 1711, commissioners were again appointed, but failed for want of the requisite means to accomplish their intended object.

In 1728 an attempt to settle the difficulties was renewed, but, as on previous occasions, it failed. The commissioners of the colonies met, but they could not agree at what place to fix the latitude thirty-six degrees thirty minutes north, nor upon the place called Wyonoke, and they broke up without doing anything. The governors of North Carolina and Virginia then entered into a convention upon the subject of the boundary between the two provinces, and transmitted it to England for approval. The king and council approved of it, and so did the lords and proprietors, and returned it to the governors to be executed. The agreement was as follows:

"That from the mouth of Carrituck River, setting the compass on the north shore thereof, a due west line shall be run and fairly marked, and if it happens to cut Chowan River between the mouth of Nottaway River and Wiccacon Creek, then the same direct course shall be continued towards the mountains, and be ever deemed the dividing line between Virginia and Carolina. But if the said west line cuts Chowan River to the southward of Wiccacon Creek, then from that point of intersection the bounds shall be allowed to continue up the middle of Chowan River to the middle of the

entrance into said Wiccacon Creek, and from thence a due west line shall divide the two governments. That if said west line cuts Blackwater River to the northward of Nottaway River, then from the point of intersection the bounds shall be allowed to be continued down the middle of said Blackwater to the middle of the· entrance into said Nottaway River, and from thence a due west line shall divide the two governments.

"That if a due west line shall be found to pass through islands or cut out small slips of land, which might much more conveniently be included in one·province or other, by natural water bounds, in such case the persons appointed for running the line shall have the power to settle natural bounds, provided the commissioners on both sides agree thereto, and that all variations from the west line· be punctually noted on the premises or plats, which they shall return to be put upon the record of both governments."

Commissioners were appointed by Virginia and North Carolina to carry this agreement into effect. They met at Currituck Inlet in March, 1728. The variation of the compass was then found to be three degrees one minute and two seconds west, nearly, and the latitude thirty-six degrees thirty-one minutes. The dividing line between the provinces struck Blackwater one hundred and seventy-six poles above the mouth of Nottaway. The variation of the compass at the mouth of Nottaway was two degrees thirty minutes. The line was afterward extended to Steep Rock Creek, 320 miles from the coast, by commissioners Joshua Fry and Peter Jefferson, on the part of Virginia, and Daniel Weldon and William Churton, on the part of North Carolina.

In 1778 and 1779 Virginia and North Carolina having become by their separation in 1776 from the British crown independent States, again took up the question of the boundary between them, and appointed commissioners to extend and complete the line from the point at which the previous commissioners, Fry and Jefferson and others, had ended their work on Steep Rock Creek, to Tennessee River. The commissioners undertook the work with which they were charged, but they could not find the line on Steep Rock Creek, owing,

as they supposed, to the large amount of timber which had decayed since it was marked. The report of their labors was signed only by the Virginia commissioners. Their report was, in substance, that after running the line as far as Carter's Valley, forty-five miles west of Steep Rock Creek, the commissioners of Carolina conceived the idea that the line was farther south than it ought to be, and, on trial, it appeared that there was a slight variation of the needle, which the Virginia commissioners thought arose from their proximity to some iron ore; that various expedients to harmonize the action of the commissioners were unavailing, and the Carolina commissioners, agreeing that they were more than two miles too far south of the proper latitude, measured off that distance directly north, and ran the line eastwardly from that place, superintended by two of the Carolina and one of the Virginia commissioners, while from the same place it was continued westwardly, superintended by the others, for the sake of expediting the business. The Virginia commissioners subsequently became satisfied that the first line run by them was correct and they, therefore, continued it from Carter's Valley, where it had been left, westward to Tennessee River. The North Carolina commissioners carried their line as far as Cumberland Mountains, protesting against the line run by the Virginia commissioners.

This was in 1779 and 1780. The line adopted by the Virginia commissioners was known as the Walker line and the line adopted by the commissioners of North Carolina was known as the Henderson line. Walker's line was approved by the legislature of Virginia in 1791, but it never received the approval of the legislature of Tennessee. Previously to the appointment of these commissioners, and on the 6th of May, 1776, the State of Virginia, in a general convention, with that generous public spirit which on all occasions since has characterized her conduct in the disposition of her claims to territory under different charters from the English government, had declared that the territories within the charters erecting the colonies of Maryland, Pennsylvania, North Carolina and South Carolina were thereby ceded and forever confirmed to the people of those colonies respectively. On the

25th of February, 1790, North Carolina ceded to the United States the territory which afterwards became the State of Tennessee, (2 Charters and Constitutions, 1664,) and which was admitted into the Union on the 1st of June, 1796. 1 Stat. 491, c. 47. Subsequently, the States of Virginia and Tennessee both took steps for the final settlement of the controversy as to the boundary between them. On the 10th of January, 1800, the house of delegates of the general assembly of Virginia adopted the following resolution: "Whereas it is represented to the present general assembly that the people living between what are called Walker's and Henderson's lines, so far as the same run between the State of Tennessee and this State, do not consider themselves under either the jurisdiction of that or this State, and, therefore, refuse the payment of any taxes to either of said States, or to the collectors of either for the general government, because the State of North Carolina, on the 25th of February, 1790, ceded the said State of Tennessee, then called the Southwestern Territory, to the government of the United States; and, therefore, the act entitled 'An act concerning the southern boundary of this State,' passed on the 7th of December, 1791, in this legislature, to establish the line commonly called Walker's line, as the boundary between North Carolina and this State, could only bind the State of North Carolina as far as her territorial limits extended on the line of this State, and could not bind the said Southwestern Territory, which had previously been conveyed, as aforesaid; and

"Whereas, Since the said cession, the general government hath erected the said Southwestern Territory into an independent State, by their act, June 1st, 1796, whereby it has become the duty of the said State of Tennessee and of this State to settle all differences between them with respect to the said boundary line:

"*Resolved, therefore*, That the executive be authorized and requested to appoint three commissioners, whose duty it shall be to meet commissioners to be appointed by the State of Tennessee, to settle and adjust all differences concerning the said boundary line, and to establish the one or the other of the

said lines as the case may be, or to run *any other line* which may be agreed on, for settling the same; and that the executive be also requested to transmit a copy of this resolution to the executive authority of the State of Tennessee."

On the 13th of January, 1800, this resolution was agreed to by the Senate.

On the 13th day of November, 1801, the general assembly of Tennessee passed an act on the same subject, Laws of Tennessee, 1801, c. 29, the first section of which is these words:

"*Be it enacted by the general assembly of the State of Tennessee,* That the governor for the time being is hereby authorized and required, as soon as may be convenient after the passing of this act, to appoint three commissioners on the part of this State, one of whom shall be a mathematician capable of taking latitude, who, when so appointed, are hereby authorized and empowered, or a majority of them, to act in conjunction with such commissioners as are or may be appointed by the State of Virginia to settle and designate a true line between the aforesaid States."

The 2d section is as follows:

"*And whereas,* It may be difficult for this legislature to ascertain with precision what powers ought of right to be delegated to the said commissioners; therefore,

"*Be it enacted,* That the governor is hereby authorized and required from time to time to issue such power to the commissioners, as he may deem proper, for the purpose of carrying into effect the object intended by this act, consistent with the true interest of the State."

On the 22d day of January, 1803, a report having been made by the commissioners, which is copied into the act, the legislature of Virginia ratified what had been done in the following act:

"Whereas, The commissioners appointed to ascertain and adjust the boundary line between this State and the State of Tennessee, in conformity to the resolution passed by the legislature of this State for that purpose, have proceeded to the execution of that business, and made a report thereof in the words following, to wit:

" ' The commissioners for ascertaining and adjusting the boundary line between the States of Virginia and Tennessee appointed pursuant to public authority on the part of each, namely: General Joseph Martin, Creed Taylor and Peter Johnson, for the former, and Moses Fisk, General John Sevier and General George Rutledge, for the latter, having met at the place previously appointed for that purpose, and not uniting, from the general result of their astronomical observations, to establish either of the former lines called Walker's and Henderson's, *unanimously agreed*, in order to *end all controversy* respecting the subject, to run a due west line equally distant from both, beginning on the summit of the mountain generally known by the name of White Top Mountain, where the northeastern corner of Tennessee terminates, to the top of Cumberland Mountain, where the southwestern corner of Virginia terminates, which is hereby declared to be the true boundary line between the said States, and has been accordingly run by Brice Martin and Nathan B. Markland, the surveyors duly appointed for that purpose, and marked under the directions of the said commissioners, as will more at large appear by the report of the said surveyors, hereto annexed, and bearing equal date herewith.

" ' 2. And the said commissioners do further unanimously agree to recommend to their respective States, that individuals having claims or titles to lands on either side of the said line, as now fixed and agreed on, and between the lines aforesaid, shall not in consequence thereof n anywise be prejudiced or affected thereby ; and that the legislatures of their respective States should pass mutual laws to render all such claims or titles secure to the owners thereof.

" ' 3. And the said commissioners do further agree unanimously to recommend to their States respectively that reciprocal laws should be passed confirming the acts of all public officers, whether magistrates, sheriffs, coroners, surveyors or constables, between the said lines, which would have been legal in either of the said States had no difference of opinion existed about the true boundary line.

" ' 4. This agreement shall be of no effect until ratified by

the legislatures of the States aforesaid. Given under our hands and seals at William Robertson's, near Cumberland Gap, December the eighth, eighteen hundred and two. (Dec. 8th, 1802.)

" ' Jos. Martin.           [L. s.]

" ' Creed Taylor.        [L. s.]

" ' Peter Johnson.      [L. s.]

" ' John Sevier.         [L. s.]

" ' Moses Fisk.          [L. s.]

" ' George Rutledge.  [L. s.] '

" 5. And whereas, Brice Martin and Nathan B. Markland, the surveyors duly appointed to run and mark the said line, have granted their certificate of the execution of their duties, which certificate is in the words following, to wit: ' The undersigned surveyors, having been fully appointed to run the boundary line between the States of Virginia and Tennessee, as directed by the commissioners for that purpose, have agreeably to their orders, run the same, beginning on the summit of the White Top Mountain at the termination of the northeastern corner of the State of Tennessee, a due west course to the top of the Cumberland Mountains, where the southwestern corner of Virginia terminates, keeping at an equal distance from the lines called Walker's and Henderson's, and have had the new line run as aforesaid marked with five chops in the form of a diamond, as directed by the said commissioners. Given under our hands and seals, this eighth day of December, eighteen hundred and two. (8th December, 1802.)

" ' B. Martin.              [L. s.]

" ' Nat. B. Markland.  [L. s.] '

" And it is deemed proper and expedient that the said boundary line, so fixed and ascertained as aforesaid, should be established and confirmed on the part of this Commonwealth—

" 6. *Be it therefore enacted by the General Assembly of the Commonwealth of Virginia*, That said boundary line between this State and the State of Tennessee, as laid down, fixed and ascertained by the said commissioners above named, in their

said report above recited, shall be and is hereby *fully* and *absolutely*, to all intents and purposes whatsoever, *ratified, established and confirmed* on the part of this Commonwealth, as the *true, certain* and *real boundary line* between the said States.

"7. All claims or titles derived from the government of North Carolina or Tennessee, which said lands by the adjustment and establishment of the line aforesaid, have fallen into this State, shall remain as secure to the owners thereof as if derived from the government of Virginia, and shall not be in anywise prejudiced or affected in consequence of the establishment of the said line.

"8. The acts of all public officers, whether magistrates, sheriffs, coroners, surveyors or constables, heretofore done or performed in that portion of the territory between the lines called Walker's and Henderson's lines, which has fallen into this State by the adjustment of the present line, and which would have been legal if done or performed in the States of North Carolina or Tennessee, are hereby recognized and confirmed.

"9. This act shall commence and be in force from and after the passing of a like law on the part of the State of Tennessee." Laws of Va. 1802–1803, c. 39.

And on the 3d of November, 1803, Tennessee passed the following ratifying act:

"Whereas, the commissioners appointed to settle and designate the true boundary between this State and the State of Virginia, in conformity to the act passed by the legislature of this State for the purpose, on the thirteenth day of November, one thousand eight hundred and one, have proceeded to the execution of said business, and made a report thereof in the words following, to wit":

(Here follows the report named in the Virginia act:)

"And it is deemed proper and expedient that the said boundary line, so fixed and ascertained as aforesaid, should be established and confirmed on the part of this State —

"1. *Be it enacted by the General Assembly of the State of Tennessee,* That the said boundary line between this State

and the State of Virginia as laid down, fixed and ascertained by the said commissioners above named in their said report above recited, shall be and is hereby fully and absolutely to all intents and purposes whatsoever, *ratified, established, and confirmed* on the part of this State as the *true, certain and real* boundary line between the said States.

"2. *Be it enacted,* That all claims or titles to lands derived from the government of Virginia, which said lands, by the adjustment and establishment of the line aforesaid have fallen into this State, shall remain as secure to the owners thereof as if derived from the government of North Carolina or Tennessee, and shall not be in anywise prejudiced or affected in consequence of the establishment of the said line.

"3. *Be it enacted,* That the acts of all officers, whether magistrates, sheriffs, coroners, surveyors or constables, heretofore done or performed in that portion of territory between the lines called Walker's and Henderson's lines, which has fallen into this State by the adjustment of the present line, and which would have been legal if done or performed in the State of Virginia, are hereby recognized and confirmed." Laws of Tennessee, 1803, c. 58.

The line thus run was accepted by both States as a satisfactory settlement of a controversy which had, under their governments and that of the colonies which preceded them, lasted for nearly a century. As seen from the acts recited, both States through their legislatures declared in the most solemn and authoritative manner that it was fully and absolutely ratified, established and confirmed as the true, certain and real boundary line between them; and this declaration could not have been more significant had it added, in express terms, what was plainly implied, that it should never be departed from by the government of either, but be respected, maintained and enforced by the governments of both. All modes of legislative action which followed it indicated its approval. Each State asserted jurisdiction on its side up to the line designated, and recognized the lawful jurisdiction of the adjoining State up to the line on the opposite side. Both States levied taxes on the lands on their respective sides and

granted franchises to the people resident thereon. The people on the south side voted at state and municipal elections for representatives and officers of Tennessee, and the people on the north side at such state and municipal elections voted for representatives and officers of Virginia. The courts of the two States exercised jurisdiction, civil and criminal, on their respective sides, and enforced their process up to that line; and the legislation of Congress in the designation of districts for the jurisdiction of courts, and in prescribing limits for collection districts and for purposes of election, made no exception to the boundary as thus established. Act of July 1, 1862, 12 Stat. 432, 433, c. 119.

The line was marked with great care by the commissioners of the States, with five chops on the trees in the form of a diamond, at such intervals between them as they deemed sufficient to identify and trace the line. Not a whisper of fraud or misconduct is made by either side against the commissioners, for the conclusions they reached and the line they established. It is true that in the year 1856, fifty-four years after the line was thus settled, Virginia, reciting that the line as marked by the commissioners in 1802 had, by lapse of time, the improvement of the country, natural waste and destruction and other causes, become indistinct, uncertain and to some extent unknown, so that many inconveniences and difficulties occurred between the citizens of the respective States and in the administration of their governments, passed an act for the appointment of commissioners, to meet commissioners to be appointed by Tennessee, to again run and mark said line, — not to run and mark a new line, — and provided that where there was no growing timber on any part of the line by which it might be plainly marked, if the old marks were gone, the commissioners should cause monuments of stone to be permanently planted on the line, at least one at every five miles or less, where it might seem best to the commissioners to do so, that the line might be readily identified for its entire length. The whole purpose of the act, as is evident on its face was, not to change the old boundary line, but only to more perfectly identify it. Tennessee responded to that invi-

tation, and appointed commissioners to act with those from Virginia. The commissioners together ro run and re-marked the line as it was established in 1802, and planted such additional monuments as were deemed necessary, and they reported to their respective legislatures that they had "accurately run, re-marked and measured the old line of 1802, with all its offsets and irregularities as shown in the surveyor's report" therein incorporated and on the accompanying map therewith submitted. The legislature of Tennessee approved of the action of the commissioners, but Virginia withheld her approval and called for a new appointment of commissioners to re-run and re-mark the line, which was refused by Tennessee as unnecessary. No complaint as to the correctness of the line run and established in 1802 was made by Virginia until within a recent period. She now by her bill asks that the compact entered into between her and the State of Tennessee, as set forth in the act of the general assembly of Virginia of January 22, 1803, and which became operative by similar action of the legislature of Tennessee on the 3d of November following, be declared null and void, as having been entered into between the States without the consent of Congress, and prays that this court will establish the true boundary line between those States due east and west, in latitude 36° and 30' north, in accordance with what it alleges to be the ancient chartered rights of that Commonwealth and the laws creating the State of Tennessee and admitting it into the Union.

The Constitution provides that "no State shall, without the consent of Congress, lay any duty of tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another State, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay."

Is the agreement, made without the consent of Congress, between Virginia and Tennessee, to appoint commissioners to run and mark the boundary line between them, within the prohibition of this clause? The terms "agreement" or "compact" taken by themselves are sufficiently comprehensive to

embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects; to those to which the United States can have no possible objection or have any interest in interfering with, as well as to those which may tend to increase and build up the political influence of the contracting States, so as to encroach upon or impair the supremacy of the United States or interfere with their rightful management of particular subjects placed under their entire control.

There are many matters upon which different States may agree that can in no respect concern the United States. If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York which the latter State might desire to acquire as a site for a public building, it would hardly be deemed essential for the latter State to obtain the consent of Congress before it could make a valid agreement with Virginia for the purchase of the land. If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie Canal, it would hardly be deemed essential for that State to obtain the consent of Congress before it could contract with New York for the transportation of the exhibits through that State in that way. If the bordering line of two States should cross some malarious and disease-producing district, there could be no possible reason, on any conceivable public grounds, to obtain the consent of Congress for the bordering States to agree to unite in draining the district, and thus removing the cause of disease. So in case of threatened invasion of cholera, plague, or other causes of sickness and death, it would be the height of absurdity to hold that the threatened States could not unite in providing means to prevent and repel the invasion of the pestilence, without obtaining the consent of Congress, which might not be at the time in session. If, then, the terms "compact" or "agreement" in the Constitution do not apply to every possible compact or agreement between one State and another, for the validity of which the consent of Congress must be obtained, to what compacts or agreements does the Constitution apply?

We can only reply by looking at the object of the constitutional provision, and construing the terms "agreement" and "compact" by reference to it. It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context. *Noscitur a sociis* is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used.

Looking at the clause in which the terms "compact" or "agreement" appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States. Story, in his Commentaries, (§ 1403,) referring to a previous part of the same section of the Constitution in which the clause in question appears, observes that its language "may be more plausibly interpreted from the terms used, 'treaty, alliance or confederation,' and upon the ground that the sense of each is best known by its association (*noscitur a sociis*) to apply to treaties of a political character; such as treaties of alliance for purposes of peace and war; and treaties of confederation, in which the parties are leagued for mutual government, political coöperation, and the exercise of political sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges"; and that "the latter clause, 'compacts and agreements,' might then very properly apply to such as regarded what might be deemed mere private rights of sovereignty; such as questions of boundary; interests in land situate in the territory of each other, and other internal regulations for the mutual comfort and convenience of States bordering on each other." And he adds: "In such cases the consent of Congress may be properly required, in order to check any infringement of the rights of the national government; and, at the same time, a total prohibition to enter into

any compact or agreement might be attended with permanent inconvenience or public mischief."

Compacts or agreements — and we do not perceive any difference in the meaning; except that the word "compact" is generally used with reference to more formal and serious engagements than is usually implied in the term "agreement" — cover all stipulations affecting the conduct or claims of the parties. The mere selection of parties to run and designate the boundary line between two States, or to designate what line should be run, of itself imports no agreement to accept the line run by them, and such action of itself does not come within the prohibition. Nor does a legislative declaration, following such line, that it is correct, and shall thereafter be deemed the true and established line, import by itself a contract or agreement with the adjoining State. It is a legislative declaration which the State and individuals, affected by the recognized boundary line, may invoke against the State as an admission, but not as a compact or agreement. The legislative declaration will take the form of an agreement or compact when it recites some consideration for it from the other party affected by it, for example, as made upon a similar declaration of the border or contracting State. The mutual declarations may then be reasonably treated as made upon mutual considerations. The compact or agreement will then be within the prohibition of the Constitution or without it, according as the establishment of the boundary line may lead or not to the increase of the political power or influence of the States affected, and thus encroach or not upon the full and free exercise of Federal authority. If the boundary established is so run as to cut off an important and valuable portion of a State, the political power of the State enlarged would be affected by the settlement of the boundary; and to an agreement for the running of such a boundary, or rather for its adoption afterwards, the consent of Congress may well be required. But the running of a boundary may have no effect upon the political influence of either State; it may simply serve to mark and define that which actually existed before, but was undefined and unmarked. In that case the agreement for the running of the line, or its actual survey,

would in no respect displace the relation of either of the States to the general government. There was, therefore, no compact or agreement between the States in this case which required, for its validity, the consent of Congress, within the meaning of the Constitution, until they had passed upon the report of the commissioners, ratified their action, and mutually declared the boundary established by them to be the true and real boundary between the States. Such ratification was mutually made by each State in consideration of the ratification of the other.

The Constitution does not state when the consent of Congress shall be given, whether it shall precede or may follow the compact made, or whether it shall be express or may be implied. In many cases the consent will usually precede the compact or agreement, as where it is to lay a duty of tonnage, to keep troops or ships of war in time of peace, or to engage in war. But where the agreement relates to a matter which could not well be considered until its nature is fully developed, it is not perceived why the consent may not be subsequently given. Story says that the consent may be implied, and is always to be implied when Congress adopts the particular act by sanctioning its objects and aiding in enforcing them; and observes that where a State is admitted into the Union, notoriously upon a compact made between it and the State of which it previously composed a part, there the act of Congress, admitting such State into the Union, is an implied consent to the terms of the compact. Knowledge by Congress of the boundaries of a State, and of its political subdivisions, may reasonably be presumed, as much of its legislation is affected by them, such as relates to the territorial jurisdiction of the courts of the United States, the extent of their collection districts, and of districts in which process, civil and criminal, of their courts may be served and enforced.

In the present case, the consent of Congress could not have preceded the execution of the compact, for, until the line was run, it could not be known where it would lie and whether or not it would receive the approval of the States. The preliminary agreement was not to accept a line run, whatever it

might be, but to receive from the commissioners designated a report as to the line which might be run and established by them. After its consideration each State was free to take such action as it might judge expedient upon their report. The approval by Congress of the compact entered into between the States upon their ratification of the action of their commissioners is fairly implied from its subsequent legislation and proceedings. The line established was treated by that body as the true boundary between the States in the assignment of territory north of it as a portion of districts set apart for judicial and revenue purposes in Virginia, and as included in territory in which federal elections were to be held, and for which appointments were to be made by federal authority in that State, and in the assignment of territory south of it as a portion of districts set apart for judicial and revenue purposes in Tennessee, and as included in territory in which federal elections were to be held, and for which federal appointments were to be made for that State. Such use of the territory on different sides of the boundary designated, in a single instance would not, perhaps, be considered as absolute proof of the assent or approval of Congress to the boundary line; but the exercise of jurisdiction by Congress over the country as a part of Tennessee on one side, and as a part of Virginia on the other, for a long succession of years, without question or dispute from any quarter, furnishes as conclusive proof of assent to it by that body as can usually be obtained from its most formal proceedings.

Independently of any effect due to the compact as such, a boundary line between States or Provinces, as between private persons, which has been run out, located and marked upon the earth, and afterwards recognized and acquiesced in by the parties for a long course of years, is conclusive, even if it be ascertained that it varies somewhat from the courses given in the original grant; and the line so established takes effect, not as an alienation of territory, but as a definition of the true and ancient boundary. Lord Hardwicke, in *Penn* v. *Lord Baltimore*, 1 Vesey Sen. 444, 448; *Boyd* v. *Graves*, 4 Wheat. 513; *Rhode Island* v. *Massachusetts*, 12 Pet. 657,

734; *United States* v. *Stone,* 2 Wall. 525, 537; *Kellogg* v. *Smith,* 7 Cush. 375, 382; *Chenery* v. *Waltham,* 8 Cush. 327; Hunt on Boundaries, (3d. ed.) 306.

As said by this court in the recent case of the *State of Indiana* v. *Kentucky,* (136 U. S. 479, 510,) "it is a principle of public law, universally recognized, that long acquiescence in the possession of territory, and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority." In the case of *Rhode Island* v. *Massachusetts,* 4 How. 591, 639, this court, speaking of the long possession of Massachusetts, and the delays in alleging any mistake in the action of the commissioners of the colonies said : "Surely this, connected with the lapse of time, must remove all doubts as to the right of the respondent under the agreements of 1711 and 1718. No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time and fall with the lives of individuals. For the security of rights, whether of States or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be invoked with greater justice and propriety than in a case of disputed boundary."

Vattel, in his Law of Nations, speaking on this subject, says: "The tranquillity of the people, the safety of States, the happiness of the human race do not allow that the possessions, empire, and other rights of nations should remain uncertain, subject to dispute and ever ready to occasion bloody wars. Between nations, therefore, it becomes necessary to admit prescription founded on length of time as a valid and incontestable title." [1] (Book II, c. 11, § 149.) And

---

[1] La tranquillité des peuples, le salut des États, le bonheur du genre humain, ne souffrent point que les possessions, l'empire, et les autres droits des Nations, demeurent incertains, sujets à contestation, et toujours en état d'exciter des guerres sanglantes. Il faut donc admettre entre les peuples la prescription fondée sur un long espace de temps, comme un moyen solide et incontestable.

Wheaton, in his International Law, says: "The writers on natural law have questioned how far that peculiar species of presumption, arising from the lapse of time, which is called *prescription*, is justly applicable as between nation and nation; but the constant and approved practice of nations shows that by whatever name it be called, the uninterrupted possession of territory or other property for a certain length of time by one State excludes the claim of every other in the same manner as, by the law of nature and the municipal code of every civilized nation, a similar possession by an individual excludes the claim of every other person to the article of property in question." (Part II, c. 4, § 164.)

There are also moral considerations which should prevent any disturbance of long recognized boundary lines; considerations springing from regard to the natural sentiments and affections which grow up for places on which persons have long resided; the attachments to country, to home and to family, on which is based all that is dearest and most valuable in life.

Notwithstanding the legislative declaration of Virginia in 1803 that the line marked by the joint commissioners of the two States was ratified as the true and real boundary between them, and the repeated reaffirmation of the same declaration in her laws since that date, notably in the Code of 1858, in the Code of 1860 and in the Code of 1887; notwithstanding that the State has in various modes attested to the correctness of the boundary — by solemn affirmation in terms, by legislation, in the administration of its government, in the levy of taxes and the election of officers, and in its acquiescence for over eighty-five years, embracing nearly the lives of three generations, she now, by her bill, seeks to throw aside the obligation from her legislative declaration, because, as alleged, not made upon the express consent, in terms, of Congress, although such consent has been indicated by long acquiescence in the assumption of the validity of the proceedings resulting in the establishment of the boundary, and to have a new boundary line between Virginia and Tennessee established running due east and west on latitude thirty-six degrees thirty minutes north.

But to this position there is, in addition to what has already been said, a conclusive answer in the language of this court in *Poole* v. *Fleeger,* 11 Pet. 185, 209. In that case Mr. Justice Story, after observing that "it is a part of the general right of sovereignty belonging to independent nations to establish and fix the disputed boundaries between their respective territories ; and the boundaries so established and fixed by compact between nations become conclusive upon all the subjects and citizens thereof, and bind their rights, and are to be treated to all intents and purposes, as the true and real boundary," adds: "This is a doctrine universally recognized in the law and practice of nations. It is a right equally belonging to the States of this Union, unless it has been surrendered under the Constitution of the United States. So far from there being any pretence of such a general surrender of the right, it is expressly recognized by the Constitution, and guarded in its exercise by a single limitation or restriction, requiring the consent of Congress." The Constitution in imposing this limitation plainly admits that with such consent a compact as to boundaries may be made between two States ; and it follows that when thus made it has full validity, and all the terms and conditions of it are equally obligatory upon the citizens of both States.

The compact in this case having received the consent of Congress, though not in express terms, yet impliedly, and subsequently, which is equally effective, became obligatory and binding upon all the citizens of both Virginia and Tennessee. Nor is it any objection that there may have been errors in the demarcation of the line, which the States thus by their compact sanctioned. After such compacts have been adhered to for years neither party can be absolved from them upon showing errors, mistakes or misapprehension of their terms, or in the line established; and this is a complete and perfect answer to the complainant's position in this case.

It may also be stated that if the work of the joint commissioners, under the laws of 1800 and 1801, approved by the legislative action of both States in 1803, could be left out of consideration and a new line run, it would not follow that the

parallel of latitude thirty-six degrees thirty minutes north would be strictly followed. The charter of Charles the Second designates the northern boundary line of the province of North Carolina as extending from Currituck River or inlet upon a straight westerly line to Wyonoke Creek, which lies *within or about thirty-six degrees thirty minutes north latitude,* from which it is evident that that parallel was only to be the general direction of the line, not one to be strictly and always followed without any variations from it. The purpose of the declaration in the charter of Charles the Second was only that the northern boundary line was to be run in the neighborhood of that parallel. The condition of the country at the time the charter was granted — 1665 — would have made the running of a boundary line strictly on that parallel a matter of great difficulty, if not impossible. Nor did the needs of grantor or chartered proprietors call for any such strict adherence to the parallel of latitude designated. That neither party expected it, is evident from the agreement made between the governors of Virginia and North Carolina as to running the boundary line between them, and sent to England for approval by the king and council. That agreement provided that, if the west line run should be found to pass through islands or to cut out small slips of land, which might much more conveniently be included in one province than the other by natural water bounds, in such case the persons appointed to run the line should have power to settle natural water bounds, provided, the commissioners on both sides agreed, and that all variations from the west line should be noted on the premises or on plats which they should return, to be put on record by both governors. A possible, indeed, a probable, variation from the line of the parallel of latitude, or the straight line designated, was contemplated by both Virginia and Tennessee. With full knowledge of the line actually designated, and of the ancient charter to Carolina, and of the description in the Constitution of Tennessee, in appointing the joint commissioners, they provided that they should settle and adjust all differences concerning the boundary line, and establish either the Walker or Henderson line, or run *any other line which might be agreed on*

*for settling the same;* and that means any line run and measured with or without deviations from time to time from a straight line, or the line of latitude mentioned as might in their judgment be most convenient as the proper boundary for both States. It was made with numerous variations from a straight line, and from the line of the designated parallel of latitude for the convenience of the two States, and, with the full knowledge of both, was ratified, established and confirmed as the true, certain and real boundary line between them. And then, fifty-six years afterwards, in consequence of the line thus marked becoming indistinct, it was re-run and re-marked, by new commissioners under the directions of the statutes of 1800 and 1801, in strict conformity with the old line. The compact of the two States, establishing the line adopted by their commissioners, and to which Congress impliedly assented after its execution, is binding upon both States and their citizens. Neither can be heard at this date to say that it was entered into upon any misapprehension of facts. No treaty, as said by this court, has been held void on the ground of misapprehension of facts, by either or both of the parties. *Rhode Island* v. *Massachusetts,* 4 How. 591, 635.

The general testimony, with hardly a dissent, is that the old line of 1802 can be readily traced throughout its whole length; and, moreover, that line has been recognized by all the residents near it, except those in the triangle at Denton's Valley and in another district of small dimensions, in which it is stated that the people have voted as citizens of Virginia and have recognized themselves as citizens of that State. That fact, however, cannot affect the potency and conclusiveness of the compact between the States by which the line was established in 1803. The small number of citizens whose expectations will be disappointed by being included in Tennessee are secured in all their rights of property by provisions of the compact passed especially for the protection of their claims.

Some observations were made, on the argument of the case, upon the propriety and necessity, if the line established in 1803 be sustained, of having it re-run and re-marked, so as hereafter to be more readily identified and traced. But a careful exam-

ination of the testimony of the numerous witnesses in the case, most of them residing in the neighborhood of the boundary line, as to the marks and identification of the line originally established in 1802, and re-run and re-marked in 1859, satisfies us that no new marking of the line is required for its ready identification. The commissioners appointed under the act of Virginia of 1856, and under the act of Tennessee of 1858, found all the old marks upon the trees in the forest through which the line established ran, in the form of a diamond; and whenever they were indistinct, or, in the judgment of the commissioners, too far removed from each other, new marks were made upon the trees, or if no trees were found at particular places to be marked, monuments in stone were planted. Besides this, the State of Virginia does not ask that the line agreed upon in 1803 shall be re-run or re-marked, but prays that a new boundary line be run on the line of 36° 30′. Tennessee does not ask that the line of 1803 be re-run or re-marked. Nevertheless, under the prayer of Virginia for general relief, there can be no objection to the restoration of any marks which may be found to have been obliterated or become indistinct upon the line as herein defined.

Our judgment, therefore, is that the boundary line established by the States of Virginia and Tennessee by the compact of 1803 is the true boundary between them, and that on a proper application, based upon a showing that any marks for the identification of that line have been obliterated or have become indistinct, an order may be made, at any time during the present term, for the restoration of such marks without any change of the line.

*A decree will, therefore, be entered declaring and adjudging that the boundary line established between the States of Virginia and Tennessee by the compact of 1803 is the real, certain and true boundary between the said States, and that the prayer of the complainant to have the said compact set aside and annulled, and to have a new boundary line run between them on the parallel of 36° 30′ north latitude should be and is denied at the cost of the complainant; and it is so ordered.*