## Battle Monuments in France.

*Constitutional law—Constitution of United States, art. i, sect. 10, par. 3—Agreements between State and foreign country—Consent of Congress—Act of May 27, 1921—Soldiers' monuments.*

1. Under the Act of May 27, 1921, P. L. 1173, the Commission created by the act has no authority to take title to lands in Belgium and France, but can only make agreements with those nations to secure permission for the State of Pennsylvania later to purchase suitable land at the places designated by the Commission for the erection of monuments.

2. Such agreements may be made without the consent of the Congress of the United States.

3. If the Commission should proceed further and undertake anything which might in any way affect the political influence or standing of the Commonwealth of Pennsylvania in its relation to the National Government, it would be necessary to have the consent of Congress.

Attorney-General's Department. Opinion to David J. Davis, Secretary of Commission to Investigate the Battlefields of France and Belgium and to Select Points for Monuments, etc., Scranton, Pa.

McNees, Dep. Att'y-Gen., Jan. 13, 1922.—The Attorney-General's Department is in receipt of your request for advice as to the extent of the authority of the Commission to Investigate the Battlefields of France and Belgium and to Select Points for Monuments, etc., as created by the Act of May 27, 1921, P. L. 1173, with especial reference as to how title should be taken to any sites which you may select in France or Belgium for the erection of monuments and markers to commemorate the achievements of Pennsylvania soldiers during the World War.

The main question divides itself into two parts: First, what sort of agreements did the legislature authorize the Commission to make; and, second, will such agreements conflict with any prohibition in the Constitution of the United States?

In determining the questions in their order, we should first consider the title to the act, which reads as follows: "An act constituting a commission to

Battle Monuments in France.

make an investigation of the battlefields of France and Belgium and to select points for the erection of monuments and markers of appropriate design to commemorate the achievements of Pennsylvania soldiers during the World War; defining the powers and duties of the Commission, and making an appropriation."

There is no intimation here that the act might contain authority to purchase land in France or Belgium. According to the title, the Commission is authorized to select points for the erection of monuments, but any right to purchase which may be discovered in the body of the act is not referred to in the title. The 1st section of the act under discussion reads as follows: "That in order to commemorate heroic achievements of the citizens of Pennsylvania who served on the battlefields of France and Belgium, and to perpetuate the memories of those who fell in the war against Germany and her allies, there shall be erected, at such points in France and Belgium as the commissioners hereinafter provided for shall designate, monuments and markers of suitable design and with proper inscription thereon to carry out the spirit and intent of this purpose."

This gives the Commission no authority to erect any monuments. It is apparent that their determination of the location is final, but some other agency may be created for the actual construction.

Section 2 of the act provides for the appointment of a commission, and section 3 proceeds to set out its duties and powers. After directing the entire membership to proceed to the battlefields of France and Belgium and to ascertain the points where Pennsylvania troops were engaged during the World War, the Commission is directed to determine the points where monuments and markers shall hereafter be erected. Following this is the paragraph which contains whatever authority there may be for the actual purchase of sites, which reads as follows:

"The Commission shall have power to enter into such agreements with the Governments of France and Belgium, either directly or through the Government of the United States, as may be necessary to secure permission for the erection of the monuments and markers at the points selected by the Commission."

By this paragraph the Commission may enter into such agreements as may be necessary to secure permission for the erection of the monuments. Any such agreement, however, should not involve the payment of money nor should it attempt to bind the Commonwealth to accept the sites agreed upon. It was the intention to be sure that the sites selected could be secured if they were later desired, and to that end the Commission should enter into agreements so that there could be no question about permission to erect monuments.

The last paragraph of section 3 reads as follows:

"The Commission shall make a complete report of its proceedings to the general assembly of 1923 not later than the first Monday of February of that year, and in such report shall state the amount of money required to prepare the monuments and markers agreed upon by the Commission and to provide for their erection at the points selected."

It is very noticeable that the Commission is not directed to report anything as to the cost of sites, but, so far as cost is concerned, they are only to set forth "the amount of money required to prepare the monuments . . . and to provide for their erection at the point selected."

From a consideration of the whole act and the title, we have concluded that your Commission does not have power to take title to lands in France or Belgium, and it is limited in the agreements it may make with those nations to

1 D. & C.

such as secure permission for the Commonwealth to later purchase or otherwise acquire suitable land at the places designated by your Commission for the erection of monuments and markers.

The second question involves a construction of article 1, section 10, paragraph 3, of the Constitution of the United States. This paragraph reads as follows:

"No state shall, without the consent of Congress, lay any duty of tonnage, keep troops, or ships of war in time of peace, enter into any agreement or compact with another state, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay."

The act creating your Commission provides in section 3, paragraph 2, that "the Commission shall have power to enter into such agreements with the Governments of France and Belgium" as we have above discussed.

Are the agreements which you are herein authorized to make with the Governments of France and Belgium, either directly or through the Government of the United States, such agreements or compacts as are prohibited by the Constitution of the United States?

The language of the Constitution is very broad and inclusive. A literal interpretation of it would require the consent of Congress before any valid agreement or compact could be entered into by the Commonwealth of Pennsylvania with any other state of the Union or with any foreign country. The object of this prohibitory clause of the Constitution was to prevent a state from entering into agreements or compacts with other states or foreign powers which might be in conflict with some agreement which the United States had made (Watson on the Constitution, 848), or that would lead to the increase of the political power or influence of the states, or in any manner encroach upon the full and free exercise of Federal authority in its relationship with other governments.

It is conceded that there is no valid legal objection to your Commission carrying out the purposes of the act creating it if the consent of Congress is secured. May you do so without this consent of Congress? We believe that, under the decisions of the Supreme Court of the United States, such agreements or compacts as you are authorized to make will not require the consent of Congress.

". . . The terms 'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects; to those to which the United States can have no possible objection or have any interest in interfering with, as well as to those which may tend to increase and build up the political influence of the contracting states, so as to encroach upon or impair the supremacy of the United States or interfere with their rightful management of particular subjects placed under their entire control.

"There are many matters upon which different states may agree that can in no respect concern the United States. If, for instance, Virginia should come into possession and ownership of a small parcel of land in New York, which the latter state might desire to acquire as a site for a public building, it would hardly be deemed essential for the latter state to obtain the consent of Congress before it could make a valid agreement with Virginia for the purchase of the land. If Massachusetts, in forwarding its exhibits to the World's Fair at Chicago, should desire to transport them a part of the distance over the Erie Canal, it would hardly be deemed essential for that state to obtain the consent of Congress before it could contract with New York for the transportation of the exhibit through that state in that way. . . . If, then,

the terms 'compact' or 'agreement' in the Constitution do not apply to every possible compact or agreement between one state and another, for the validity of which the consent of Congress must be obtained, to what compacts or agreements does the Constitution apply?

"We can only reply by looking at the object of the constitutional provision and construing the terms 'agreement' and 'compact' by reference to it. . . .

"Looking at the clause in which the terms 'compact' or 'agreement' appear, it is evident that the prohibition is directed to the formation of any combination tending to the increase of political power in the states which may encroach upon or interfere with the just supremacy of the United States. . . .

"Compacts or agreements—and we do not perceive any difference in the meaning except that the word 'compact' is generally used with reference to more formal and serious engagements than is usually implied in the term 'agreement'—cover all stipulations affecting the conduct or claims of the parties. . . . The compact or agreement will then be within the prohibition of the Constitution or without it, according as the establishment of the boundary line may lead or not to the increase of the political power or influence of the states affected, and thus encroach or not upon the full and free exercise of Federal authority. If the boundary established is so run as to cut off an important and valuable portion of a state, the political power of the state enlarged would be affected by the settlement of the boundary; and to an agreement for the running of such a boundary, or rather for its adoption afterwards, the consent of Congress may well be required: . . ." State of Virginia v. State of Tennessee, 148 U. S. 503, 517-520.

It is not a new thing for Pennsylvania to enact laws providing for the erection of memorial tablets outside of its boundaries.

The Act of April 14, 1903, P. L. 174, provided for the erection of memorial tablets or monuments to mark the position, on the field of Antietam, of certain Pennsylvania commands. Part of this act reads as follows: "That the Governor shall appoint three commissioners, whose duty it shall be to act in conjunction with the representatives or committee from each of said commands for the purchase of ground, when found necessary to do so, and in the selection of the site, design, material and inscription for the monument or tablet to mark the position of each command on the battlefield; that it shall be the further duty of the said commissioners to contract for the erection of each monument or tablet."

In construing this act, Attorney-General Carson said: "It is apparent from this language that the commissioners appointed by the Governor are clothed with the necessary power to make contracts for the purchase and erection of these monuments, and that the Survivors' Association is recognized only for the purpose of consultation on the design, place or location and other preliminary matter."

While it is true that the direct question here involved was not decided in that opinion, yet it could scarcely have been overlooked when the question was being considered.

By the Act of May 15, 1903, P. L. 415, $15,000 was appropriated "for the purchase of ground and erection of suitable monuments and memorial tablets to mark the position occupied in the line of entrenchments around the City of Vicksburg," etc. This act also was interpreted by Attorney-General Carson in determining whether or not the commission might place one large monument or several small ones.

We have come to a conclusion that a reasonable exercise of the duties devolving upon you as herein suggested will not be in conflict with article I,

1 D. & C.

section 10, paragraph 3, of the Constitution of the United States. Were you to proceed beyond that point, however, and to undertake anything which could in any way affect the political influence or standing of the Commonwealth of Pennsylvania in its relation to the other states or the National Government, it would be necessary to have the consent of Congress.

From Guy H. Davies, Harrisburg, Pa.