REQUESTED BY: Dave Heineman, Governor, State of Nebraska
You have requested our opinion regarding the proposed Platte River Cooperative Agreement. Specifically, you ask our opinion "whether or not Nebraska will retain the flexibility to withdraw from the Platte River Cooperative Agreement, without penalty, at any time or for any reason." You have further requested that we analyze whether the agreement has the force and effect of a binding water compact.
COOPERATIVE AGREEMENT
The State of Nebraska is considering whether to enter into a multi-state and federal agreement with the states of Wyoming and Colorado and the Secretary of the Department of the Interior to implement a recovery program for endangered and threatened species in the Central Platte River valley of Nebraska, the Platte River Recovery Implementation Program Cooperative Agreement ("Cooperative Agreement").
The Platte River originates in the mountains of Wyoming and Colorado and, as it flows through Nebraska, provides important habitat for the whooping crane, piping plover, interior least tern, and pallid sturgeon that are listed as threatened or endangered under the
Endangered Species Act ("ESA"). Fifty-four miles of the river and adjacent lands in Nebraska have been designated as critical habitat for the whooping crane. Habitat for these species in Nebraska has been significantly altered by water development and by other changes that have come with extensive settlement and development throughout the Platte River Basin. Fifteen major dams and reservoirs have been constructed in the Basin to provide water for millions of acres of irrigated farmland, production of hydroelectric power, and municipal supply to about 3.5 million people. The river and these water storage projects also provide for important flood control, recreation, and fish and wildlife habitat.
Since the late 1970s, the U.S. Fish Wildlife Service has issued "jeopardy biological opinions" for virtually all Federal actions that deplete water in the Basin. These biological opinions, rendered pursuant to section 7(a)(2) of the ESA, cite new and/or continued water depletions as contributing factors toward jeopardizing the continued existence of the listed species and adversely modifying designated critical habitat for the whooping crane. Significant time and money was expended by numerous public and private entities during ESA consultation processes and in developing alternatives to avoid jeopardizing the continued existence of the target species.
In an effort to address the issues raised in the jeopardy biological opinions, the three states (Wyoming, Colorado, and Nebraska) and the Federal government developed a Cooperative Agreement, signed in July 1997. This agreement established a Governance Committee to develop a proposal for a recovery implementation program. The Governance Committee represents the three states, water users, environmental groups, and Federal agencies. Several subcommittees to the Governance Committee were also formed. These subcommittees have diverse representation from the three states, local landowners, water users, environmental organizations, and Federal agencies. The Cooperative Agreement also established important parameters for the Program, including acquiring land only from willing sellers/lessors, an incremental approach to water and land milestones, adaptive management, and paying taxes on program lands.
The general program purpose is to implement the Cooperative Agreement's first increment to offset some of the impacts to the listed species and their habitat located in the Central and Lower Platte River corridor caused by historic, current, and future water-related activities, through the implementation of land and water management actions which result in listed species habitat restoration, creation, and/or enhancement. By meeting the milestones set forth in the program, numerous water activities will be provided ESA compliance.
The question raised involves a specific clause in the Cooperative Agreement. Section II. E. provides:
Withdrawal of a Signatory and Termination . Only the Secretary of the Interior, after a meeting with the three Governors, can determine that the Department of Interior (DOI) will withdraw from the Program. Only a Governor of a state can determine, after a meeting with the Secretary of the Interior and the Governors of the other two states that his or her state will withdraw from the Program. If a signatory determines to withdraw from the Program, the reasons for withdrawal are to be provided in writing to the other signatories and made public. This Program Agreement terminates upon the withdrawal of a signatory or by mutual agreement of the signatories. Following a withdrawal by any one of the signatories, the other signatories are to determine whether and under what circumstances the Program could continue under a new cooperative agreement. Upon Program termination, whether or not some signatories seek to develop a successor Program, the signatories agree to resolve the then-existing legal obligations under contracts and arrange for disposition of Program assets.
ANALYSIS
The determination of the enforceability of the withdrawal provision is a part of the larger question of the enforceability of the Cooperative Agreement. By its own terms the Cooperative Agreement is a voluntary program that relies on the willingness of participants to act within the processes created by the Cooperative Agreement. Section II. J. provides:
No Admissions by States. The states are entering into this Program Agreement on a voluntary and cooperative basis in an effort to resolve ESA species conflicts through a negotiated and mutually agreed upon basin-wide program. Nothing herein shall constitute an admission that any water related activities or new water related activities have caused or will cause adverse effects to the target species or their habitats.
Likewise, the Agreement specifically protects the states from actions to enforce its terms by the other states or the DOI. Section II. L. provides that "[t]he signatories to this Agreement do not waive sovereign immunity by entering into this Agreement and specifically retain immunity and all defenses available to them as sovereigns pursuant to state and federal law."
Based on the plain language of the agreement, the State of Nebraska has retained the ability to withdraw from the agreement at any time and for any reason. The State has also retained its sovereign immunity from legal challenge to enforce any extra-contractual obligation to perform under the agreement should it choose to withdraw.
In addition, the agreement appears to be consistent with and enforceable under state law. The Governor has broad powers under Article I, Section 6 of the Constitution of the State of Nebraska to "take care that the laws be faithfully executed and the affairs of the state efficiently and economically administered." The administration of the surface waters of the state has been delegated to the Department of Natural Resources (Neb. Rev. Stat. § 61-206 (Supp. 2004)) and the administration of ground water to the Natural Resources Districts (Neb. Rev. Stat. § 46-702
(2004)). It is within the powers of these entities to adopt rules and regulations sufficient to carry out the necessary conservation measures pursuant to the Groundwater Management and Protection Act. Neb. Rev. Stat. §§ 46-701 to 46-753 (2004).
We do not find any specific conflict with existing state law.
If additional regulatory authority for NDNR or the affected NRDs, beyond that provided by the Groundwater Management and Protection Act, is necessary to implement the Program, that authority will require legislative action. While the Program can be implemented by regulation alone, any use of retirement of irrigated acres will also require legislative action to fund or authorize funding by any affected political subdivisions.
The nature of the Cooperative Agreement raises an additional issue with regard to withdrawal and enforceability. In order for the Federal agencies to implement the agreement, Congress will have to pass authorizing and appropriation legislation. A current authorization bill has been proposed by Senator Allard of Colorado. Section 104 of the bill provides for cost-sharing by the states. Unlike the other, permissive sections of the bill, the Non-Federal Share provision provides that "each State shall be responsible for 1/3 of the [non-federal] costs." This mandatory provision may be interpreted as requiring financial, money or in-kind contributions, from the state regardless if the state has withdrawn from the agreement. This result is unlikely given that the Program will terminate upon withdrawal by any participant but some residual financial obligation may exist.
The final question is whether the agreement may have the force and effect of a "water compact." Article I, Section 10, Clause 3
of the U.S. Constitution provides that "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State. . . ." The U.S. Supreme Court has interpreted the Compact Clause as not requiring every agreement between states to require the consent of Congress. U.S. Steel Corp. v. Multistate Tax Commission, 434 U.S. 452, 469 (1978). The Compact Clause is triggered where the agreement "is directed to the formation of any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." Virginia v. Tennessee,148 U.S. 503, 519 (1893). Put another way, does the agreement project a new presence onto the federal system or alter any state's basic sphere of authority?
In this situation, section I.G. of the Cooperative Agreement specifically provides that "`[a]lthough this Program Agreement sets forth a cooperative process, all signatories to this Program Agreement recognize that they each have statutory responsibilities that cannot be delegated, and that this Program Agreement does not and is not intended to abrogate any of their statutory responsibilities." Likewise, the federal participation is authorized by the provisions of the ESA and does not encroach upon or interfere with the supremacy of the United States.
CONCLUSION
On this basis, it appears to us that the Governor has the authority to enter into and, if he or his successors so decide, to withdraw from the Cooperative Agreement. The Cooperative Agreement as applied to water administration in Nebraska is consistent and compatible with existing state and federal law. Moreover, by agreeing to voluntarily manage water use in Nebraska in accordance with the PRRIP, Governor Heineman essentially agrees that a state agency under his direction and control will perform tasks which it is already authorized to do in a manner consistent with its statutory authority. We believe that the Governor has the ability to act in that fashion, even absent legislative action to codify the Cooperative Agreement. Should funding be necessary to implement the agreement, the Legislature will have to appropriate the necessary funds.
It is our opinion that Governor Heineman has not entered into a compact with the states of Colorado and Wyoming which might obligate the State of Nebraska to comply with water use limitations if the State were to withdraw. In this agreement, the Governors simply agree to conduct certain water management in their respective states and land management in Nebraska in conformance with the Cooperative Agreement, and in a manner consistent with existing statutory authority for agencies under their control. For those reasons, we believe that current Nebraska statutes do allow the Governor to join the State in the Cooperative Agreement and for the State to withdraw at any time or for any reason.
Sincerely,
 JON BRUNING Attorney General
 David Cookson Special Counsel
APPROVED:
 ____________________________ Attorney General