**POPE et al. v. BLANTON, County Judge, et al.**

District Court, N. D. Florida.

Feb. 13, 1935.

Sutton, Tillman & Reeves, of Tampa, Fla., for plaintiffs.

Cary D. Landis, Atty. Gen., of the state of Florida, H. E. Carter and J. V. Keen, Asst. Attys. Gen., and William T. Hendry, of Perry, Fla., for defendants.

Before BRYAN, Circuit Judge, and AKERMAN and LONG, District Judges.

LONG, District Judge.

This is the second time this case has been presented to this court upon application for temporary injunction. First upon original bill, at which time injunction was denied for the reasons set forth in the opinion filed July 13, 1934. 10 F. Supp. 15. It is now before the court upon the amended bill, motion to strike, and supporting affidavits.

Plaintiffs, citizens of Florida, seek to enjoin the enforcement of chapter 7389, Act of 1917, § 4, Comp. Gen. Laws, § 8087, of Florida, providing that it shall be unlawful for any person "to maintain and use for the purpose of catching or taking commercial sponges from the Gulf of Mexico, or the Straits of Florida or other waters within the territorial limits of the State of Florida, diving suits, helmets or other apparatus used by deep sea divers."

The amended bill seeks to enjoin the defendant Kokinos from making affidavits to obtain warrants; the county judge from issuing warrants; the sheriff from making arrests; the state attorney and circuit judge from proceeding with the trials; and all defendants, and each of them, from interfering with plaintiffs while taking sponges beyond the 3-mile limits of the state of Florida. In the opinion of July 13, 1934, we said: "The general rule is that criminal prosecutions may not be enjoined. An exception of this rule is recognized where rights of property are involved and the damages are irreparable; but even then it is unheard of to enjoin courts of another jurisdiction." By the amended bill, plaintiffs undertake to show that property rights are involved; that the damages are irreparable, and that jurisdiction attaches in order to prevent a multiplicity of suits; that plaintiffs have large investments in boats and other equipment; that their boats and other equipment are used in gathering sponges by the method of diving; that the boats are of a value greater than $3,000 each; that those other than the owners are employed on the boats; that they are dependent upon this employment for a livelihood; that their sales through the sponge exchange amount to some $300,000 yearly; that the profits are distributed among them; that in excess of 50 per cent. of the sponges are gathered from 5 to 10½ miles off the shore of Taylor county; that off the shore of this particular county sponges grow more rapidly and are more easily gathered than any other place; that because of the acts of defendants, plaintiffs will suffer irreparable damage unless defendants are restrained from enforcing the Florida statute prohibiting the taking of sponges by the diving method a distance of three leagues from the shore line.

The allegations in the amended bill seeking injunction to prevent multiplicity of suits are that plaintiffs have been threatened by defendants other than the circuit judge with arrests should they attempt to take sponges from the waters off the shore of Taylor county in excess of 3 miles from shore and less than 10 miles from shore.

The jurisdiction of a federal court of equity attaches only when the rights of property are involved and the damages are irreparable (see former opinion this court filed July 13, 1934, 10 F. Supp. 15; Cline v. Frink Dairy, 274 U. S. 445, 47 S. Ct. 681, 71 L. Ed. 1146); and in order to prevent a multiplicity of suits (Dearborn Publishing Co. v. Fitzgerald [D. C.] 271 F. 479).

In the original bill plaintiffs complained of interference with them in gathering the sponges 7 to 50 miles off shore. In the amended pleading the complaint is interference from 5 to 10½ miles off shore. This pleading is silent as to what part of the sponges are gathered within the distance of from 5 to 9 miles, and what part are gathered within the distance of from 9 to 10½ miles. It does not appear that the territory off the shore of Taylor county is the only place where plaintiffs may engage in the gathering of sponges; on the contrary, the amended bill shows that sponges are gathered from the waters off the shore of other counties.

In passing upon the sufficiency of a bill seeking a temporary injunction, the court will consider whether or not the injury to the public outweighs the injury to the plaintiffs which would result from the refusal to grant the relief. 32 C. J. 81; Cubbins v. Mississippi River Commission (D. C.) 204 F. 299; F. W. Cook Brewing Co. v. Garber (C. C.) 168 F. 942.

The statute, Act of 1917, prohibiting the gathering of sponges by the diving method from the territorial waters of Florida

was passed for the purpose of protecting and perpetuating one of the great natural resources and important industries of the state. Prior to the enactment of this statute, sponges were taken from the waters of the Gulf of Mexico, along the shores of the state, either by the use of tongs or by the diving method. The Legislature of the state, in order that this natural resource and important industry be protected, and perpetuated, enacted the statute prohibiting the gathering of sponges by the use of diving suits, helmets, and other such apparatus.

■ The Legislature is the judge of the necessity of such an enactment, and the presumption is that their action was taken advisedly. Further, it appears by counter affidavits filed by defendants, "that, through the use of diving suits, which include heavy iron shoes, the sponge growth in the bottom of the waters of the Gulf of Mexico is seriously injured and usually totally destroyed, and that the taking of sponges by such means would so injure the sponge growth in such area that the industry would be practically destroyed."

■ The record discloses that some $600,000 worth of sponges are marketed annually through "Tarpon Springs" Exchange alone; that approximately one-fourth of the product comes from off the shores of Taylor county; so the Legislature, recognizing the value of this great industry to the people of the state, enacted the law complained of. It must therefore appear that the injury to the state in granting the injunction would outweigh the injury to the plaintiffs in refusing to grant the injunction.

The next, and most important, question is whether the state of Florida by its Constitution may establish the boundaries which it has established in the Gulf of Mexico. It is provided by article 2 of the Treaty of February 22, 1819, between Spain and the United States (8 Stat. 254): "His Catholic Majesty cedes to the United States, in full property and sovereignty, all the territories which belong to him, situated to the eastward of the Mississippi, known by the name of East and West Florida."

Section 5 of the Act of Congress, March 3, 1845 (5 Stat. 743), admitting Florida into the Union, provided: "That said State of Florida shall embrace the territories of East and West Florida, which by the treaty of amity, settlement and limits between the United States and Spain, on the twenty-second day of February, eighteen hundred and nineteen, were ceded to the United States."

Article 12 of the Constitution of 1838 provided: "The jurisdiction of the State of Florida shall extend over the Territories of East and West Florida, which, by the treaty of amity, settlement, and limits, between the United States and His Catholic Majesty, on the 22d day of February, A. D. 1819, were ceded to the United States."

Article 12 of the Constitution of 1861 provided the same boundaries as fixed by the Constitution of 1838. The Constitution of 1865, art. 12, established the boundaries of the state as follows: "Commencing at the mouth of the river Perdido, from thence up the middle of said river to where it intersects the southern boundary-line of the State of Alabama, on the thirty-first degree of north latitude; then due east to the Chattahoochee river; thence down the middle of said river to its confluence with the Flint River; from thence straight to the head of the Saint Mary's River; thence down the middle of said river to the Atlantic Ocean; thence southwardly to the Gulf of Florida and Gulf of Mexico; thence northwardly and westwardly, including all islands within five leagues of the shore, to the beginning."

The Constitution of 1868, art. 1, defined the boundaries: "Commencing at the mouth of the river Perdido; from thence up the middle of said river to where it intersects the south boundary line of the State of Alabama, and the thirty-first degree of north latitude; then due east to the Chattahoochee river; then down the middle of said river to its confluence with the Flint river; from thence straight to the head of the St. Mary's river; then down the middle of said river to the Atlantic ocean; thence southeastwardly along the coast to the edge of the Gulf Stream; thence southwestwardly along the edge of the Gulf Stream and Florida Reefs to and including the Tortugas Islands; thence northeastwardly to a point three leagues from the mainland; thence northwestwardly three leagues from the land, to a point west of the mouth of the Perdido river; thence to the place of beginning."

The boundaries of the state are defined in the Constitution of 1885, art. 1, identically the same as in the Constitution of 1868.

So far as the state courts are concerned, the question of the territorial jurisdiction of the state has been settled by the Supreme Court of the state. Lipscomb v. Gialourakis, 101 Fla. 1130, 133 So. 104.

It is the contention of plaintiffs that the boundaries of the state, as set out in the Constitution of 1868 and the Constitution of 1885, are illegal and void, because they conflict with the Treaty of Spain and the United States; because they conflict with the Act of Congress admitting the state into the Union, March 3, 1845, in that the Constitutions fix the boundaries at three leagues off shore where the law did not contemplate extending the boundaries but one league off shore.

The Treaty fixed the boundaries of Florida as the East and West Floridas, together with adjacent islands. The Act of Congress admitting the state to the Union fixed these boundaries as set out in the Treaty. This act in effect described one of the boundaries as being the Gulf of Mexico. Under international law this means that the jurisdiction of the state extends one league into the Gulf, or 3 miles. Admitting that the boundaries of the state were limited to one league off shore by the Treaty, and by Act of Congress admitting the state into the Union, and so remained until the Constitution of 1868, there is no rule of law to prevent the state, with the approval of Congress, from fixing the boundaries. It may be that it is usual to do this at the time of admission into the Union, but that does not signify that it cannot be done at any other time by agreement between the state and the Congress, so long as the change does not affect the territory of another state. Louisiana v. Mississippi, 202 U. S. 1, 26 S. Ct. 408, 50 L. Ed. 913; New Mexico v. Colorado, 267 U. S. 30, 45 S. Ct. 202, 69 L. Ed. 499; Arkansas v. Tennessee, 246 U. S. 158, 38 S. Ct. 301, 62 L. Ed. 638, L. R. A. 1918D, 258.

On the 2d day of March, 1867 (14 Stat. 428), an act was passed by Congress entitled, "An Act to provide for the more efficient Government of the Rebel States." The act declared that in these states, of which Florida was one, there was no adequate protection for life or property; that it was for the federal government to enforce law and order until such time as state government could be established. These rebel states were divided into military districts and the President authorized to appoint military directors; these directors, or Governors, to have charge of their respective districts. These states were deprived of their representation in Congress until a proper state Constitution was adopted; that upon its approval by Congress, and upon the states' adoption of the Fourteenth Amendment to the Federal Constitution, they would be entitled to representation.

On March 23, 1867 (15 Stat. 2), the Congress passed an act entitled, "An Act supplementary to an Act entitled 'An Act to provide for the more efficient Government of the Rebel States,' passed March second, eighteen hundred and sixty-seven, and to facilitate Restoration."

This supplemental act required these states to adopt a state Constitution in conformity with the terms of the act; that after the state Constitution had been adopted by the Convention and ratified by the people, a copy should be sent to Congress, and, if the Congress approved, the state be declared entitled to representation, and her Representatives and Senators admitted to Congress.

On June 25, 1868 (15 Stat. 73), Congress passed an act entitled, "An Act to admit the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, to Representation in Congress." This act recited that these states had adopted Constitutions in accordance with the Act of March 2, 1867; that as soon as Florida ratified the Fourteenth Amendment to the Federal Constitution, her Representatives and Senators would be entitled to take their place in the National Congress as representing a state of the Union. Under the act it was the duty of the President, within ten days after receiving notice of ratification, to issue a proclamation of ratification.

In the Constitution of 1868 and 1885, the boundary of the state is described as three leagues from the mainland in the Gulf of Mexico. Under the holding of our Supreme Court, the states of the Union have been in existence since their admission into the Union. Keith v. Clark, 97 U. S. 454, 24 L. Ed. 1071; Texas v. White et al., 74 U. S. (7 Wall.) 700, 19 L. Ed. 227.

In this particular case, however, while Florida was not admitted to the Union after the conflict between the states, it was required by Congress to adopt a new Constitution. It was deprived of its privileges of statehood in that it was not permitted to be represented in the Congress; that in order to again enjoy the privileges of statehood, it must meet the requirements of Congress by adopting a new Constitution; in which Constitution one of the boundaries was changed from one league from the mainland to three leagues in the Gulf of Mexico.

**22**

The Congress accepted this Constitution of 1868 by the passage of Act of June 25, 1868, reciting that the state had adopted a Constitution in accordance with the Act of March 2, 1867, permitting its Representatives and Senators to take their places as representing a state of the Union; thereby accepting this change in the boundaries, and in effect recognizing that the boundaries of Florida had been extended into the Gulf of Mexico in accordance with the description given in the new Constitution.

■ The consent of Congress need not be expressed, if it is implied from the acquiescence of Congress, and this may appear subsequently as well as at the time "the compact in this case, having received the consent of congress, though not in express terms, yet impliedly, subsequently, which is equally effective, became obligatory and binding upon all the citizens of both Virginia and Tennessee." Virginia v. Tennessee, 148 U. S. 503, text 525, 13 S. Ct. 728, 737, 37 L. Ed. 537.

■ Coequal with that of nations, it is a right of sovereignty inherent in states to fix their boundaries subject to the limitation, with the consent of Congress, and when a state acts with the consent of Congress, either expressed or implied, its action becomes conclusive upon the citizens. Virginia v. Tennessee, supra, Mr. Justice Field quoting from Poole v. Fleeger, 11 Pet. 185, 209, 9 L. Ed. 680.

■ Provisions of a Treaty with a foreign nation are subject to such acts as Congress may pass for their enforcement, modification, or repeal. Head Money Cases, 112 U. S. 580, 5 S. Ct. 247, 28 L. Ed. 798.

"By the Constitution of the United States a treaty and a statute are placed on the same footing, and if the two are inconsistent, the one last in date will control, provided the stipulation of the treaty on the subject is self-executing." Whitney v. Robertson, 124 U. S. 190, headnote, 8 S. Ct. 456, 31 L. Ed. 386.

"The statute is a law equally with the treaty, and, if subsequent and conflicting with the treaty, supersedes the latter." Horner v. United States, 143 U. S. 570, text 578, 12 S. Ct. 522, 525, 36 L. Ed. 266.

■ The Constitution of 1885 is identical in description of the boundary of the state as set out in the Constitution of 1868, which Constitution was approved by Congress. Even if it could be successfully contended that a citizen of the state could invoke the jurisdiction of the courts for the purpose of questioning the boundaries of a sovereign state, nearly fifty years have passed since the adoption and ratification by the people of this latter Constitution. The right of the state to fix its boundaries has never been questioned by any nation, by the Congress, or before, by any citizen of the state, and this acquiescence over a long period of time in the establishment of the boundary of the state is not only entitled to consideration by a court in determining the right of the citizen to question the power of the sovereign state to change its boundary, but sufficient to estop the subject from questioning the right of the state to exercise dominion over its boundaries fixed by the Constitution and approved by the Congress. Virginia v. Tennessee, supra, text, pages 522 and 523 of 148 U. S., 13 S. Ct. 728, 37 L. Ed. 537, and cases therein cited.

The application for interlocutory injunction is denied.