**UNITED STATES v. FLEGENHEIMER.**

District Court, D. New Jersey.

Oct. 22, 1935.

F. W. H. Adams, U. S. Atty., for the Southern District of New York, and J. Howard Carter, Asst. U. S. Atty., and Sp. Asst. to the Atty. Gen., both of New York City, John Burke, Sp. Asst. to the Atty. Gen., and William F. Smith, Asst. U. S. Atty., for the District of New Jersey, of Trenton, N. J.

J. Richard Davis, of New York City, John E. Toolan, of Perth Amboy, N. J., and George S. Silzer and Harry H. Weinberger, both of Newark, N. J., for defendant.

CLARK, District Judge.

The filing of the affidavit of bias and prejudice in the case at bar sets, in this court's humble opinion, a new low-water mark in the administration of criminal justice in the United States. The affidavit charges that we have a "bias and prejudice in favor of the United States of America." Our bias and prejudice in favor of the country we are proud to serve goes to the extent of wishing we could play some small part in correcting the conditions which permit such an attempt to disqualify us from the performance of our duty.

Those conditions are being adverted to with increasing frequency by our wise men. The last two Chief Justices, the last two Attorney Generals, the last two presidents of the American Bar Association have on numerous occasions given the public the impression that they considered the current enforcement of the criminal law a real American Tragedy. Only three days ago the present distinguished Attorney General was quoted by ships' news (New York Herald Tribune, October 18, 1935) reporters as follows: "I am convinced more than ever that one of the greatest deterrents to crime prevention in this country has been the abuse of the bail system. Under our bail system men can prolong their escape from justice indefinitely."

We respectfully call the present proceedings to his attention.

During their pendency, crime conferences have been held in both the demanding (New York) and asylum (New Jersey) states. At the former, the Governor had a good deal to say about the abuses which he thought had grown up in the practice of the criminal law. The principal purpose of the latter was, by curious coincidence, the improvement of the procedure

for making crime a matter of national, and not local, concern.

We might digress here for a minute to comment on the form of the solution suggested to the New Jersey conference. We have observed a recent tendency to discover hitherto unexpected merits in the fundamental charter. So there, has been much talk about the compact clause of the Constitution (article 1, § 10, cl. 3). We have rather wondered if the talkers have taken the trouble to either read or consider this provision. It appears in the form of a prohibition against, not a grant to, the states. It was obviously intended to prevent alliances among the individual states which might affect the political supremacy of the United States. The United States Supreme Court has so declared and has not found the prescribed "consent of Congress" necessary to other agreements between the states. Virginia v. Tennessee, 148 U. S. 503, 518, 13 S. Ct. 728, 37 L. Ed. 537.

In other words, the Constitution can have just nothing at all to do with a compact of extradition. To say that it has, is, in our view, no service to the obvious need for uniformity. A state Legislature can express its recognition of such a need much more simply by the passage of the uniform law of extradition. Although the Uniform Law Commissions submitted such a law on July 12, 1926, only fourteen states have so far acted favorably thereon (cf. Uniform Criminal Extradition Act, Uniform Laws Annotated, 1935 Pocket Part). Perhaps the abuses herein described may expedite the movement.

We do not wish to extend this digression unduly. However, we have been amazed at the indifference with which our leading political scientists treat the experience of the other great federations. The subject under discussion, the Australian Commonwealth, the Dominion of Canada, the Union of South Africa, and the late German Republic have unanimously held to be for the nation and not for the states (cf. Australian Constitution, chapter 1, part 5, clause 28, "influx of criminals"; British North America Act, section 91, chapter 27; "the criminal law," South Africa Act of 1909, chapter 16; Constitution of the German Republic, article 7, clauses 2 and 3, "criminal law, penal administration and official cooperation between administrative authorities."

We suggest that the field for unformity widens with civilization. So we find the leading French writer on Federalism, Professor Louis Le Fur in "Etat Federal et Confederation d'Etats":

"S'il est en effet tres avantageux que des provinces different entre elles par les moeurs et les usages puissent avoir chacune, sur les points ou elles different les uns les autres, leur legislation particuliere, et eviter ainsi l'application d'une legislation uniforme qui pourrait ne s'adapter parfaitement aux besoins d'aucune d'elles, il n'est pas moins certain en revanche que le manque d'uniformite legislative, quand il est pousse trop loin peut entrainer a sa suite les inconvenients les plus graves. * * *

"L'experience a fait connaitre quelles etaient les matieres ou une legislation uniforme etait necessaire ou favorable au bon fonetionnement de la constitution et au developpement de la prosperite publique, et les constitutions federatives modroit de reglementer toutes ces matieres par des lois federales, applicables par consequent a l'ensemble de la nation." (Pages 341, 342)

And much more recently (1935), in somewhat different language, a committee of the American Bar Association gave expression to the same thought:

"* * * If the completion of this movement for uniformity should be unduly delayed, then in order to prevent the multiplication of variant state laws of such a conflicting nature as to hamper the healthy development of aviation the suggested federal constitutional amendment should be adopted. The need for a broader uniformity of practice than now exists, either through state acceptance of uniformity or through federal assumption of full control, seems sufficiently acute to justify the remedy of constitutional change if a uniform law is not generally adopted." Reports of the American Bar Association, Vol. 60, pp. 423, 424.

The line between stagnation by uniformity and inequity by diversity is not static. By the same token one standard does not require one administration. The Australian Constitution, modeled very precisely after ours, was adopted in 1899. In 1926 this problem of diversity brought about a re-examination by a national commission which held extensive hearings (2,000 pages). One of the commissioners had this to say: "Next our attention is arrested by observing that there are several of the major sides of national life now partly or wholly vested in the States as to which the interests of all Australia are uniform and indissolubly interconnected, and the control and regulation of which should certainly be the function of the national Parliament only. Apart from the profound question of the effect of a uniform system in moulding a consistent national outlook referred to hereinafter, there is the enormous practical advantage that where legislation imposes a charge upon industry, this charge will be uniform throughout the continent. We refer particularly to the body of laws regulating the relation of employer and employee." Report of the Royal Commission on the Constitution of Australia, p. 243.

We are reluctant to express our personal view of the part played by counsel in what we consider a manifest perversion of justice. We have, of course, no concern with the gentleman from New York. We understand that his connection with the present defendant is the subject of proceedings pending in that state. One of the three officers of our court appearing in the case has already been a defendant in removal proceedings before us. United States v. Harry H. Weinberger et al., 4 F. Supp. 892. In them he made the same plea of persecution by this same United States Attorney. Our own Court of Appeals (U. S. ex rel. Harry H. Weinberger et al. v. Schneider, 66 F.(2d) 563) considered it quite without merit for it sustained our order of removal. If the present United States Attorney for the Southern District of New York is in the habit of persecuting people the remedy is by his impeachment.

The other two New Jersey counsel hold or have held high positions in our commonwealth; one as prosecutor and state Senator and the other as prosecutor, state Senator, judge, and Governor. We are sure that they are quite incapable of any consciously unethical practices. We dissent so strongly, however, from their conception of an attorney's duty that we are resorting to the machinery of the American Bar Association for an adjudication. We quite concede the right of all of us to be heard through counsel and to make such defense as the law permits. We do not conceive that such right includes the right to select not only the forum for such hearing, but also the actual judge who shall preside. Yet that is exactly what is attempted in this case.

The defendant Flegenheimer is under indictment in New York for conspiracy to

evade the income tax laws. This indictment is found in 1933. For two years a bench warrant from the United States District Court for the Southern District of New York for his apprehension is outstanding. In all that time and after diligent search, neither the Department of Justice nor the police force of New York City are able to find him to serve the warrant. Last spring he appears with two attorneys of Albany county and surrenders to a United States Commissioner there and is held on $75,000 bail for removal to the Southern District of New York. While those proceedings are pending he is indicted and tried in the Northern District for the substantive offense of income tax evasion. After one mistrial and one acquittal, he leaves the Northern District and goes to another district (Connecticut) in the same circuit.

Thereupon his New York counsel retain on his behalf some one or all of the New Jersey counsel now appearing before us. The retainer is by their candid concession for the express purpose of taking him before a certain designated United States Commissioner in our district, surrendering him, and asking that bail be fixed pending his resistance to any removal proceedings which may be instituted (a repetition, be it noted, of the proceedings in Albany).

We may say we did not need the concession above stated. This defendant's sudden appearance in our district cried aloud for an explanation. The testimony adduced at the hearing before us supplied it in good measure. Defendant registered in a hotel at Perth Amboy. The registration card was in the name of M. Golden and party. There was no explanation of the identity of Golden, and the party consisted of the defendant and one Max Silverman, by his admission a professional bail bondsman. This Silverman is now under indictment in Essex county, Newark, N. J., and has had various other brushes with the law. State of New Jersey v. Silverman, 100 N. J. Law, 249, 250, 126 A. 618. His connection with the defendant was not fully elucidated, but it is not unreasonable to suppose that it may have derived from Silverman's association with the Greater City Indemnity Company, a New York bail bond writing company whose activities in this court were terminated by us (wisely, as it turned out, for it and several successor companies failed).

Some one in M. Golden's party communicated with that member of Flegenheimer's legal staff who has his offices in Perth Amboy. The latter advised the local deputy chief of police of Flegenheimer's then whereabouts. This functionary proceeded to the hotel and arrested him under our local disorderly persons act. In what way sitting on a bed in a hotel room makes one a disorderly person is not clear to this court. Anyway, Flegenheimer was taken before the local recorder (acting) and released on $10,000 bail furnished by two friends of the said Silverman from Elizabeth and Newark, respectively. The fortunate and timely appearance of these two gentlemen gives the impression that they were also in the M. Golden party, but we lack positive proof.

The next morning (the night's lodging for the entire M. Golden party was, according to the hotel records, $.90) Flegenheimer with Silverman and his local counsel motored to New Brunswick, and Flegenheimer surrendered to our United States Commissioner at his law offices there. The said Commissioner was not, we assume, unduly surprised by his visitors, because forty-eight hours previously he had been sought out by said local counsel and advised of the plan Upon receipt of such advices the former had spoken on the telephone with the United States Attorney's office in New York.

As a result of this last conversation, two of the latter's assistants appeared before us at 10:10 a. m. September 26th, with a petition for the removal of Flegenheimer and a request for the issuance of a bench warrant for Flegenheimer's immediate appearance before us. They based their application upon section 591, title 18 U.S.C. A., which by its terms authorizes such procedure. The petition for removal was ordered filed and the clerk of the court issued a warrant in open court in accordance with the prescribed procedure.

The Assistant United States Attorneys and one of our deputy marshals proceeded to the Commissioner's office and encountered the defendant, his New York counsel, and his then only local counsel in the process of surrendering him, and asking for $10,000 bail. Thereupon we were called from the trial of a civil case to hear opinions on the telephone from counsel and mirabile dictu from our Commissioner that the latter's jurisdiction was paramount and our bench warrant a nugatory interference therewith. This extraordinary theory was

based on another section of the Code (section 595, title 18 U.S.C.A.) which had absolutely nothing to do with either the courts or the Commissioner's jurisdiction, but prescribed the duties of United States Marshals.

■ The situation thus disclosed raises this question of legal ethics. Any accused is entitled to his day in court. Is he entitled first to personally avoid that day in court, and second, is an officer of the court where he is to have that day entitled to contrive with an officer of another court to use that other court to avoid or at least postpone that day? The answer to the first question depends upon some rather unsatisfactory and, in our opinion, unsound law. We have already discussed it in our opinion in the case of United States v. Weinberger et al., above cited. One might suppose that resistance to extradition should depend upon proof that the technical name asylum is substantial also. In other words, that the accusation or its prosecution proceeds from motives other than the punishment of crime; for instance, race prejudice, or religious bigotry. This should be so in international extradition, a fortiori in interstate and more a fortiori in interdistrict.

The position of an attorney is in our view different from that of the accused. An accused may flee and the law permits him to resist extradition. Upon his arrest. he is entitled to be represented in that resistance. His ethics in so fleeing are not, under the existing state of the law, considered a relevant issue. That does not mean that they may not be of the worst. If an attorney connives at those ethics by conniving at his flight, we think that attorney's ethics are in issue. The attorney owes a duty to assist the processes of all courts. Justification of the arrangement of a flight and a surrender to resist the process of the court fled from requires assertion and proof that a fair trial (anywhere because of change of venue provisions) in the demanding state or district was impossible. We have heard no responsible assertion of such facts.

The subsequent procedure of counsel seems to us equally questionable. Upon the defendant's appearance on September 26th, the government's request that he be held in $75,000 bail (the amount previously fixed by the New York District Judge) was after a statement of the facts and argument thereon granted by us. The defendant was remitted in custody for the night, and the

next morning we were asked by additional counsel to reverse our previous decision. This we refused to do, and, to give the Court of Appeals the full benefit of the facts from the mouths of witnesses, all concerned with the surrender were called. Also the sureties offered by Flegenheimer were examined and found to be acquaintances of the bondsman Silverman and another professional bondsman. No one of them had ever seen or even heard of the defendant before. These sureties were rejected on the ground that bail by its very nature required the persons interested in the defendant to be "respectable" (the word used by the cases).

On October 3d we were visited in our chambers by all three of Flegenheimer's New Jersey counsel, and were informed by them that our jurisdiction was to be challenged by the filing of an affidavit of bias and prejudice (a copy of which was shown to us). The grounds alleged were our making a record of the facts surrounding the defendant's surrender. We thereupon asked the attorney who was present thereat if the surrender was not deliberate and arranged in advance through him. This he very fairly admitted to be the fact. The posture then was that the court showed bias in ascertaining the truth. Further, all counsel stated that they opposed their client's course, and they both thought and had advised him that the court was not biased and prejudiced against him. They finally departed with the declaration that they would withdraw the affidavit as written and would endeavor to convince Flegenheimer of his error. There was a stenographer present during these proceedings.

On October 18th, the adjourned date of the removal proceedings, counsel filed the affidavit which is the subject-matter of this opinion. The grounds of personal bias and prejudice stated therein are two. First, eight lines from the court's remarks at the hearing on bail. They are:

"The Court: I know nothing about this defendant, Mr. Weinberger, except what the District Attorney tells me.

"Mr. Weinberger: Well, if your Honor doesn't know anything about him except what he told you, if he pictures some things the way he pictures a lot of things, we don't always agree, I don't know. I don't know what he told your Honor.

"The Court: He told me in open court."

And then further:

"The Court: Governor Silzer told me yesterday that your defendant—I mean in open court—was visiting friends in Perth Amboy. The District Attorney advises me that he was registered at some hotel in Perth Amboy.

"Mr. Weinberger: Is your Honor going to try that issue?

"The Court: Under a false name."

Second, a rather lengthy newspaper article from the April 18, 1933 (31 months ago), issue of a New York abbreviated newspaper. The only references to the court and the defendant in this article were as follows: "Charges that Dutch Schultz has acquired one of the Government's new 3.2 legal beer permits and that the New York beer baron ordered the execution of Max Hassel and Max Greenberg to protect his newly-legitimized territory from invasion will be presented today to Attorney General Homer S. Cummings. This information came last night from Federal Judge William Clark."

The excerpt from the bail hearing (September 26th) was, in substance at least, what was in the withdrawn affidavit. The newspaper article was entirely new matter.

Before we discuss in detail the validity of this affidavit, the statute under which it is filed requires some notice. It was enacted as part of the Judicial Code of 1911 (section 21) and is now found in section 25, title 28 U.S.C.A. It reads as follows: "Whenever a party to any action or proceeding, civil or criminal, shall make and file an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of any opposite party to the suit, such judge shall proceed no further therein, but another judge shall be designated in the manner prescribed in section 24 of this title, or chosen in the manner prescribed in section 27 of this title, to hear such matter. Every such affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term of the court, or good cause shall be shown for the failure to file it within such time. No party shall be entitled in any case to file more than one such affidavit; and no such affidavit shall be filed unless accompanied by a certificate of counsel of record that such affidavit and application are made in good faith."

We have had previous occasion to consider this legislation (in assisting our judicial colleagues). We thought then and think now that it expresses an unsound policy. Distinguished members of the Congress expressed similar opinions at the time of its passage. Congressional Record, House, vol. 46, part 3:

"Mr. Bennet of New York. I understand that this amendment covers criminal offenses. I have observed that the defendant in a criminal action usually seeks delay; quite naturally, I assume, but it is the usual course. Would it not be possible for such a man, or for any criminal, to get a lawyer whose idea of ethics is not as high as is the gentleman's from Indiana to file affidavits alleging cause and vacate the bench so far as the judge is concerned, and then, with the difficulty that there always is in getting another United States judge to sit, might it not result in delay which would be not only an interference with justice but in some cases a substantial denial of justice?" Page 2,627.

"Mr. Mann of Illinois. While there may be evils under the present law, if this amendment goes into operation, after it has been in operation a short time there will be more evils growing up under it than we can think of. It is almost impossible in the large cities of the country, under the existing laws, to obtain the speedy conviction of well-known criminals." Page 2,629.

It has been unanimously condemned by the judiciary and by students of the law:

"The prophecy of the Supreme Court that litigants and their attorneys would abuse the privileges which the statute conferred has been confirmed. In the vast majority of reported cases the courts have held the affidavits to be inadequate and insufficient to divest the trial judges of jurisdiction to proceed with the hearings. In most instances the cases were decided after the courts had defined the fundamental requirements of the law. These decisions lead to the conclusion that the statute has been employed to procure delays, to obtain hearings before a judge whose views litigants believed to be less harsh than those of the judge originally assigned to the case, and to make records for appellate tribunals in order to obtain reversals because of the failure of district judges to retire from proceedings. Judges are naturally reluctant to institute contempt or disbarment actions, and they prefer to protect fellow members of their profession. The statute, however,

has been construed strictly. This construction is the only practical relief afforded against the evil of affidavits which are not filed in good faith. It may be hoped that in the future the same rule of strict construction will be followed to the end that judges' may exercise their legitimate functions in the trial of cases." St. Louis Law Review, June, 1935, at page 331.

And see, also: "Perhaps the matter could be most easily and satisfactorily handled by the submission of the affidavits directly to à superior court on an application for prohibition. This method would avoid the absurdity of forcing the trial judge to decide whether certain acts which he knows are false would, if true, be sufficient to constitute prejudice in law." 29 Harvard Law Review at page 431.

It seems to stem from our tendency to overlook the truth of Pope's famous couplet:

"For forms of government let fools contest
Whate'er is best administer'd is best."

The procedure is a purely American product. So we find Sir William Blackstone saying in his Commentaries: "For the law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea." 3 Bl. Comm. 361.

The extent of the English confidence in their judges is well illustrated in the following quotations from the law lords (Thellusson v. Rendlesham, 7 House of Lords Cases, p. 428):

"Lord St. Leonards took the opportunity of observing that he had been counsel in various branches of this cause on different occasions; in 1825, on the question of the right of presentation to the advowson, and again in 1831, when he argued a point which was not now in dispute; he mentioned these facts, but as he did not conceive that they absolved him from doing his duty in giving advice to their Lordships in the appeal now to be heard, he intended to take part in the hearing." Page 429.

"Lord Brougham trusted that it would not be assumed that the having been counsel in a cause operated as a disqualification to prevent the same person, when raised to the Bench, from taking part in the decision of that cause; for, if that was the rule, it might, under certain circumstances, produce terrible delay and expense to the suitor, and even an absolute denial of justice, especially if applied to a Judge of the Court of Chancery." Pages 429, 430.

It would seem to be better so. The judge who does not realize and therefore act on such an easily recognizable feeling as personal bias and prejudice is not fit for his office. Continuance in such blindness should result in impeachment, not disqualification. That some litigants might suffer meanwhile would seem demanded by general consideration of the effective administration of justice. We said might suffer because, in the rare cases where a judge so far forgot a proper conception of the judicial office as to sit in spite his bias and prejudice, any emanations thereof would be subject to correction by the appropriate court of appeals.

The statute which we have criticized generally is also open to particular objection. Facts stated on information and belief cannot be denied or disproved but if within the definition of personal bias and prejudice automatically disqualify. A ridiculous instance of this occurred in the leading case on the subject. Berger et al. v. United States, 255 U. S. page 22, 41 S. Ct. 230, 65 L. Ed. 481. There the affidavit quoted a trial judge as saying something in open court which the actual transcript of the proceedings showed he had not said at all. Nevertheless, the Supreme Court felt constrained (with dissent) to disqualify the judge.

The same thing is true of the newspaper article in the principal case. It is triple hearsay. Flegenheimer is told by a newspaper reporter that we have told the reporter three years ago that some one else is going to accuse him of crime. We, as a matter of fact, made no such statement, and could, if the statute permitted it, easily so prove. We say easily, because at the time of the events described in the article attached to the affidavit it became our duty to call the attention of Governor Lehman and his Commissioner of Alcohol, Mulrooney, to certain information in the hands of the government relating to two breweries recently licensed in their state. We have examined the copies of that correspondence and neither defendant's name nor alias appears therein. We cannot believe that we would have omitted it from a discussion to which, according to the quotation, it was so pertinent, and we are led to be-

lieve that the reporter, or rewrite man, or some one along the human chain, made a not unnatural mistake.

Although foreclosed from proof of veracity, we are required by the law to determine whether the article itself is a disqualification. We think not. First it quotes this court as saying that it has been told that some one is going to charge this defendant with murder. We are not quoted as making the charge ourselves, of knowing who is making it, or of having any knowledge of its truth or falsity. As far as appears, we may have believed it to be unjust and its effect may have been to prejudice us in favor of the present defendant. Second, there is no real pretense that the defendant has any other source of information than the newspaper article. He says, in effect, that so and so told me (through the newspapers) that judge so and so said so and so about me. That does not seem to us sufficient. Obviously his assertions of fact must be his own or else the source of his information must be disclosed; otherwise the prosecution for perjury, which alone will prevent defendants capriciously and maliciously selecting their judges, becomes impossible.

We are not going to dignify the quotations from the record of the bail hearing by any discussion at all. The only reference they make to the defendant is the repetition of a statement of the United States District Attorney made in securing the bench warrant. We expressed no opinion whatever with regard to that statement (which turned out to be accurate), and it would be preposterous to accuse a judge of personal bias against a litigant every time he sought an answer from the latter's lawyer in response to an argument of counsel.

█ So we conclude that the affidavit as a matter of legal sufficiency does not disclose the statutory bias and prejudice. Even if it did, we should be constrained to disregard its challenge. This, for two reasons; we do not think that it is filed in time, and we do not think the certificate of counsel complies with the statute.

██ The statute provides that the affidavit shall be filed ten days before the commencement of the term, or good cause be shown why it has not been so filed. The good cause so required is shown in this affidavit by the following language: " * * * For the reason that the term commenced prior to the institution of the proceeding leading to his arrest and prior to the ascertainment of the facts hereinafter more particularly referred to and specified in said affidavit." Affidavit, page 1.

Counsel stood and stands on this language. We, of course, concede that the term had already commenced before the institution of the proceedings. The second ground of bias and prejudice arose out of the actual proceedings in the cause. The remedy for it is by way of appeal through assignment of errors and exceptions in the record. The statute is for the purpose of providing a change of judicial venue, not to correct a trial attitude that exhibits bias and prejudice. The appellate courts are quite capable of attending to that.

Counsel refused to either state or permit proof of the time at which the existence of the newspaper article constituting the second ground of bias and prejudice came into possession of either defendant or his counsel. So far as we are informed, defendant may actually keep a clipping bureau or a scrap book. If he does, it may have included the article he now complains of. If it had, he knew of the alleged bias and prejudice at the commencement of the removal proceedings. There are many other circumstances under which the defendant may have come in the possession of the article he complained of. He obviously cannot be permitted to await the development of what he conceives to be unfavorable rulings and then render them nugatory by filing an affidavit. In a very recent case, Bommarito v. United States (C. C. A.) 61 F.(2d) 355, at page 356, the court dealt with the time of the filing of the affidavit of bias and prejudice, and said:

"The affidavits contain no sufficient statement as to when and how the information mentioned by the affiant was obtained, and they are obviously—all the affidavits are obviously insufficient, don't comply with the statute even with reference to the time of filing, and in other respects fail to comply with the statute.

"For those reasons, the affidavits and applications will be overruled and denied."

There is also a very thorough and comprehensive note on the whole subject of affidavits of bias and prejudice which is to be found in United States Law Review, October, 1933, pages 487 to 496, which includes citations of cases on this particular detail of procedure.

■ The affidavit is, in our view, further invalidated because of the form of the certificate of counsel attached thereto. It is there certified that the application and affidavit are made in good faith by the defendant. We do not conceive that this is the purpose of the certificate. The terms of the statute include no such qualification as is apparently read into it by counsel. It is not there stated that the affidavit and application are made in good faith "by him, by the party or any words of that character." Clearly, the statute could not have been so drawn. Counsel can hardly be required to certify to the good faith of a client. They cannot be asked to set themselves up as guarantors of his mental processes. They can only be required to certify with respect to their own. In the case at bar, they would manifestly have not even attempted to do so. In the proceedings in our chambers on October 3d, all three of them repeatedly stated their belief in our freedom from bias and prejudice. One of them had previously filed affidavits of bias and prejudice against a Supreme Court justice of this state and against a common pleas judge of this state. This might have had some bearing on his good faith in the premises, were it not for the fact that he also joined with other counsel in repeating his confidence in our ability to try the defendant impartially. Another one of them wished to withdraw his signature from the certificate at the hearing on October 18th. After a conference in open court with his colleagues, participated in by the defendant, he finally decided to allow his signature to remain. We may say that the participation of the defendant above referred to was of such a minatory (threatening) character that we were compelled to admonish him from the bench.

Some of the grounds on which we are ordering the affidavit stricken from the files are substantial and some technical in the sense that we do not feel that it complies with the strict terms of the statute. We wish to emphasize, therefore, that if we had any feeling that we were personally biased and prejudiced against the defendant we would be the first to avail ourselves of the provisions of section 25, title 28 U.S. C.A. The provisions thereof have been cited at length on page —— hereinabove with the exception of this now pertinent sentence: "The same proceedings shall be had when the presiding judge shall file with the clerk of the court a certificate that he deems himself unable for any reason to preside with absolute impartiality in the pending suit or action."

As a matter of fact, this court offered to do so in a case brought against the bondsman Silverman (Zetzer v. Max Silverman) within the last month. Our offer to recuse was rejected by Mr. Silverman's counsel, now of counsel in this case.

The highest court in our state has commented on the position of a judge who may as he goes about his daily business have some impression with respect to a class or classes of defendants. In State of New Jersey v. Bolitho, 103 N. J. Law, 246, 136 A. 164, at page 168, they said: "We may safely assume that every law-abiding citizen is naturally at war with violators of the law and hence is more or less interested in the suppression of crime, which interest springs, not only from a sense of self-protection, but also from a duty to protect the community as well, against unlawful acts of its members, and therefore it is quite obvious that, in order to entertain the notion stressed in the brief of counsel of plaintiff in error, we would be driven to the ludicrous declaration that such an interest, as above indicated, disqualifies a judge or juror from sitting in judgment, impartially, between the state and the accused. Such a course would deal a disastrous blow to our judicial system."

The fact is that this particular judge is quite free from such an impression with respect to this particular defendant. He happens to have been out of the country at the time when the latter's previous trials were appearing in the metropolitan journals.

For reasons given, this affidavit and application must be, and it is ordered, stricken from the files.

Addendum.

CLARK, District Judge.

This opinion was filed at Newark, N. J., at 10:30 a. m. on October 22, 1935. At 10:30 p. m. on October 23, 1935, the defendant and two companions were shot and mortally wounded by "persons unknown as they sat at a table in a tavern in Newark in this District. Before them as they sat were tabulations of large sums of money."

He has been thus removed to the jurisdiction where we must all stand trial and needs appear before the one Judge without bias and prejudice.[1]

---

[1] The following charge was delivered to the grand jury by Judge Clark after the termination of the above case:

I am sure you have been following the amazing developments of the Schultz case. Its grisly termination has at least had the effect of disturbing the ever-present apathy of a public whose absorption in its own affairs gives the racketeer his opportunity.

It is no good crying over spilt milk or spilt ethics either. The latter will, I hope, become the concern of the American Bar Association. There is, however, one problem presented whose proper solution you can, if you will, further dramatize. As you know, the late Flegenheimer came to New Jersey for one purpose and for one purpose only. He was advised that by so doing he could delay and perhaps even avoid a trial in the state where he had been charged with crime. Unfortunately that advice was, from his point of view, sound. From our point of view as members of a public interested in the suppression and therefore the speedy punishment of crime, you can help in shifting the emphasis.

To that end I should like to have you study the present United States statutes which govern the subject of the removal of persons charged with crime from one federal district to . another. I say I should like to have you laymen examine the statutes. I say this quite realizing that it may *appear* to you at first blush a matter for legal experts only. Past yielding to this appearance has been one of the major mistakes in the public's attitude toward crime. In line with this thought we find Justice Francis Martin of the Appellate Division of New York saying: "The type of lawyer who uses his ability to enable the dangerous criminal to escape the law or to take advantage of an opponent is an enemy of the legal profession and of his government." Partly through the conservative habit developed by a worship of precedents, those broomsticks on which the legal brethren delight to ride, and partly from much less creditable motives, the legal experts have manfully resisted most attempts to make the criminal law compatible with the reality that criminals happen to be bad men. For that reason I have always felt that lawyers should choose words and not shape policy, should be draftsmen and not legislators. I am sure your own traditional legal advisor, Mr. Arrowsmith, will be glad to accept the role I am thus assigning to him. If he is not, my own enfeebled legal intellect is at your disposal.

When you come to examine the law on the subject of removal, as extradition between federal districts is called, you will, I think, quite realize the truth of my aspersion on adherence to precedent. In the first place, you may very well ask yourselves why there should be any law on the subject anyway. One might take the view that we are a country "one and indissoluble" and that an offender against its laws was automatically punishable anywhere within their scope. Instead of being indissoluble in this respect, the division of the country into court districts has resulted in a machinery for the evasion of justice made to order for such persons as Schultz.

I have said you should examine the United States statutes (they are U.S. C.A., title 18, § 591 et seq.). I should more accurately have asked you to examine what the United States courts have done by their silences. Because that action proceeds from the highest and unchangeable court, any recommendation you may see fit to make must assume legislative form.

Any sovereign, in the governmental sense, has a right to object (or comment) to what is done within its domain. Having such a right, it can punish as long as it has physical power over the offender. Extradition in the larger sense widens the power; should it go further and pass upon the right?

By definition the power of the objecting state should only be widened where it has something to object to. In other words, where there has been an offense within its territory and the person sought is the offender. So the law should and does require some formal embodiment of the charge (an indictment on information) and proof of identity.

From this point on, the law as now written takes a most curious turn. One might imagine that a sovereign might say we will only widen our neighbor's sovereign power if we are sure that it will not be abused. For instance, we will not turn over the fugitive if he can show us that his judges will be influenced by factors irrelevant to whether he has actually done what is objected to by the demanding state. One might conceive of such factors as "religion, race or economic or political beliefs." As a matter of fact, such a position would not be justified as between the states or districts of the

594

## NETTLES v. RHETT et al.

District Court, E. D. South Carolina.

April 25, 1936.

United States. This, because the due process clause of the Constitution (Amendment 14) gives the Supreme Court the right to intervene and prevent any state abusing its power by appealing to such factors rather than to the facts.

However that may be, the law of extradition (removal) is silent on such abuses and almost vociferous in permitting proof of the truth of the charges made. In a society made up of fallible human beings, justice cannot depend on the absolute truth. That remains forever in the soul of the accused. Some one must make the accusation. Some one must pass upon it. Both some ones are part of the administration of the criminal law. A difference between them frees the accused. That difference does not give him a grievance to be compensated for by money or otherwise. If it did, society becomes the victim of its own fairness.

So an individual is not even paid for successfully answering an accusation from which he has not fled. In extradition there is an added element. To make the answer, the accused must travel—sometimes through the Hudson Tunnel or tube, sometimes the breadth of the continent. If he makes it successfully, he might well be compensated, or, if not that, his compensation might be made to depend on the reasonableness of forcing him to make the journey.

Some perversion of this last thought seems to have moulded the law. We say "perversion" because it is one thing to compensate and quite another to espouse. In other words, the asylum state might well make the rendition conditional on compensation following acquittal instead of undertaking to determine for itself the probabilities of the latter. It seems thoroughly illogical to give the stranger within our gates a better break than the falsely accused native.

Or it may be that the present state of the law of extradition proceeds from another confusion. The member of so-

ciety freed from an accusation suffers for the common good. To force prosecuting officials to guess correctly at the verdict of a petit juror or else subject the state to damages would manifestly hamper the enforcement of the criminal law. The posture is entirely different, however, when private members of the body politic undertake to bring about official action. It is always their privilege and sometimes their duty to do so. If the result is the suffering caused by an accusation found to be false, considerations of public policy do not enter into the question of compensation in the same degree. The state does not want help from those whose motives are unworthy or whose judgment of the facts is bad. For that reason, the law permits a recovery in what are known as the actions of false imprisonment and malicious prosecution wherever the action of the volunteer assistant to the state has been taken maliciously and without probable cause.

It is the last phrase which the courts and the statutes have made their standard in extradition proceedings. They have placed the demanding state in the position of the private citizen and required a showing of probable cause that the crime has been committed. The demanding state is, of course, not a private citizen and its official machinery of justice is entitled to as much consideration as that of the asylum state. The utmost concession then should be an allowance for the added circumstance of travel. To base that allowance on reasonableness rather than probable cause would work in favor of an accused afterwards acquitted in the demanding state.

How can this result be legislatively accomplished? As far as removal from one federal district to another is concerned very simply. By an amendment or addition to the United States Code. It is my thought that your body may see fit to suggest such an amendment. Like everything else in this world of ours, the problem is not a new one and amendments to the removal section of

the Judicial Code (section 28 [28 U.S. C.A. § 71]) have been suggested in other years. We find that at least as far back as 1900 a bill was introduced in the Senate and numbered 4190 (page 4157 of Congressional Record). After its passage it was referred to the House Judiciary Committee where it apparently died. It was, however, discussed in the newspapers at the time (New York Evening Post, April 4, 1900; New York Sun, April 25, May 4 and 5, 1900; New York Times, May 7, 1900). I shall furnish your honorable body with a copy of the bill for such suggestions as it may contain. In substance removal by its terms followed upon the presentation of the indictment and the identification of the defendant. If that had been the law to-day, I venture the opinion that he would never have appeared first in Albany and then in Perth Amboy. There is always talk of dividing New Jersey into two federal districts. If this were done, a man could rob a bank in New Brunswick, cross the Raritan, and resist his removal for trial in the court for a year or so.

The problem of extradition between states is not quite so simple. This, because a federal form of government, ex necessitate, complicates the solution of problems requiring uniformity, or perhaps it would be better to say that a federal government requires the determination of what situations do require that uniformity and if the determination is made unwisely efficiency suffers. It is interesting to observe that in the Federations of Canada, Australia, South Africa, and the German Republic, the matter of extradition is assigned explicitly to the nation and not the states.

The provision of our own Constitution reads as follows: "A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the Crime." Article

4, § 2, cl. 2. It was thought not to be self-executing and therefore implemented by a statute in 1793 which was couched in practically the same language (section 662 of title 18 U.S.C.A.).

The extent of the power conferred by this clause of the Constitution seems to be uncertain. The only case in the United States Supreme Court thereon is Commonwealth of Kentucky v. Dennison, Governor of Ohio, 24 How. 66, 16 L.Ed. 717. It is a very interesting one both in its facts and in its law. There Kentucky mandamused the Governor of Ohio to surrender one Lago, "a free man of color" who was charged in Kentucky with the crime of assisting Charlotte, a slave, to escape. The Governor of Ohio had refused to honor the requisition of the Governor of Kentucky on the theory that the Constitution did not require extradition for any crimes which were not such at common law. This curious interpretation of the words "other crime" in the Constitution was held to be totally erroneous by Chief Justice Taney of the United States Supreme Court. The latter, however, dismissed the rule on the ground that the act of Congress did not provide any means to compel the Governor of Ohio to act. With that Chief Justice's almost fatal tendency for dictum, he went on to say that the Constitution itself did not permit of any such compulsion. This case has been criticized as an example of an extreme state's rights decision (8 Harvard Law Review, 416), and it would be difficult to predict a decision of the present high court. As the Constitution as now written gives the federal government no power over interstate extradition, we were compelled to resort to the legislation of the different members of the federation, namely, the sovereign states. We have been, however, considerably astonished by the form of this perhaps necessary resorting. We refer to the current movement for interstate compacts.

I have noticed a tendency to discover unexpected qualities in the fundamental

R. E. Whiting, of Columbia, S. C., Eugene S. Blease, of Newberry, S. C., and John I. Cosgrove, of Charleston, S. C., for plaintiff.

Mitchell & Horlbeck, Stoney, Crosland & Pritchard, Huger, Wilbur, Miller & Mouzon, Nathans & Sinkler, and Lionel K. Legge, all of Charleston, S. C., for defendants.

charter. Perhaps that follows in a time when some are unkind to suggest unexpected defects. So the compact clause has been adverted to by many people who have pretty obviously never read it. In the first place, it is referred to as if it contained a grant of power to the states. It contains nothing of the sort, but is a prohibition conditional on the consent of Congress. In the second place, that clause has no application to such matters as extradition, agreements covering wage scales, etc., which some are suggesting its use for. The clause has only been interpreted twice by the courts, by the United States Supreme Court in Virginia v. Tennessee, 148 U. S. 503, 13 S.Ct. 728, 37 L.Ed. 537, and by a lower federal court in Pope v. Blanton (D.C.) 10 F.Supp. 18, at page 22. Both cases declare that the intent of the provision was to require the consent of Congress for such agreements between states as affected the national supremacy and such matters only. So boundary agreements were held the furtherest limit to the constitutional prohibition, and the Supreme Court expressly declared that the states need not go to Congress for permission to "unite in providing means to prevent and repel the invasion of the pestilence without obtaining the consent of Congress, which might not be at the time in session." 148 U.S. 503, at page 518, 13 S.Ct. 728, 734, 37 L.Ed. 537.

So clearly all talk of the constitutional clause being relevant to extradition is nonsense. As a state acts through its Legislature whether it is ratifying a compact or passing a law, it would seem useful for the state Legislatures to get together. In that aspect is the recent crime conference on sound ground? I think not, because there already exists machinery for this legislative get together. This machinery is the uniform law commission with commissioners from each state. These commissioners have already drafted a uniform extradition act and have submitted it to the states as long ago as 1926. In all that intervening eight years, only fourteen states have adopted it, and the commissioners for New Jersey never even took the trouble to have it introduced in our Legislature. I might note that this uniform act refers in its section 15 to what I have tried to indicate is the fallacy of probable cause.

In conclusion I respectfully suggest that the New Jersey crime conference co-operate with this grand jury in drafting an extradition act for introduction in Congress under section 2, cl. 2, of article 4 of the Constitution, or, if they are too proud to do that, that they at least make some effort to obtain the passage in New Jersey of an effective uniform act, but that, in any event, they abandon the cumbersome and unnecessary machinery of an interstate compact.

N. B.—The ruling above referred to has been withheld by the Ethics and Grievance Committee of the American Bar Association on the ground that the appeal to the Circuit Court of Appeals on behalf of the deceased Schultz is still pending and undecided.